MARYLAND CASUALTY COMPANY, demandante y recurrida, *v.* SAN JUAN RACING ASSOCIATION, INC., demandada y recurrente.

*Número:* 12,486   *Resuelto:* 22 de septiembre de 1961.

*Córdova & González* y *Jorge L. Córdova, Jr.*, abogados de la recurrente; *Géigel & Silva, Jaime A. García Blanco* y *Hernán G. Pesquera*, abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Hernández Matos, como Presidente de Sala, y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

La anterior Comisión Hípica exigió a la San Juan Racing Association, Inc. la prestación de una fianza por la suma de $50,000. para asegurar la construcción dentro de determinado período de tiempo del hipódromo que se conocería por El Comandante. La póliza fue firmada en los Estados Unidos, en la ciudad de Pittsburgh, pero fue refrendada en Puerto Rico por el agente local de la compañía aseguradora. La agencia de San Juan había rehusado expedir la póliza cuando fue solicitada aquí. La demandada, al firmarse la póliza en Pittsburgh, satisfizo la suma de $2,500 correspondiente a la prima del primer año de acuerdo con los tipos prevalecientes en el estado de Pennsylvania, pero no hizo pago alguno en los próximos dos años. Y para cobrar las primas correspondientes a esos dos años se instó este pleito. La defensa de la demandada está predicada en la tesis de que al contrato celebrado se aplican los tipos vigentes en Puerto Rico[1] y no los del estado de Pennsylvania. Sostiene que si así se determinara, la demandante debe devolverle el exceso que hizo en el pago inicial, y a ese efecto contrademandó. El tribunal de instancia declaró con lugar la demanda y sostuvo que el contrato de fianza celebrado se rige por las leyes de Pennsylvania.

¿Es correcta la conclusión de la corte a quo al efecto de que el contrato de fianza objeto de este pleito se rige por las leyes del estado norteamericano?

Existe gran diversidad de criterios entre las autoridades en cuanto a la ley que se aplica cuando diferentes etapas de una contratación se efectúan en distintas jurisdicciones. *Ponce* v. *Badrena e Hijos, Inc.*, 74 D.P.R. 225

---

[1] Aparentemente los tipos vigentes en Puerto Rico son mucho más bajos que los de Pennsylvania.

(1952). La disparidad es aun mayor cuando se trata de contratos de seguro. Véase *Zogg* v. *Penn Mutual Life Insurance Company*, 276 F.2d 861 (2d Cir. 1960).

En el presente caso, la solicitud fue radicada en Pittsburgh. En aquella ciudad se firmó la póliza y se pagó la prima correspondiente al primer año. En Puerto Rico se refrendó [2] el contrato por el agente autorizado de la compañía aseguradora en esta plaza. El asegurado tenía establecidas localmente sus oficinas; la compañía-aseguradora estaba autorizada a hacer negocios en la Isla y la Comisión Hípica, entidad a favor de la cual se expidió la fianza, era una agencia del Estado Libre Asociado. El hipódromo se construiría en Puerto Rico.

Para resolver situaciones análogas hay autoridades que aplican la ley del estado en donde se firmó la póliza y se satisfizo la prima original. *Gray* v. *Metropolitan Life Ins. Co.*, 150 S.W.2d 563 (Mo. 1941); *Hinchey* v. *National Surety Company*, 111 A.2d 827 (N.H. 1955); 12 *Appleman Ins. L. & P.*, sec. 7079 (ed. 1943). Otras autoridades se deciden por la ley del estado donde se ejecutó el último acto necesario para darle validez a la póliza. *Martin* v. *Zurich General Accident & Liability Ins. Co.*, 13 F. Supp. 162 (D.C. R.I. 1935); *New York Life Ins. Co.* v. *Chapman*, 132 F.2d 688 (8th Cir. 1943); 12 *Appleman Ins. L. & P.*, § 7080 (ed. 1943).

Antes de proseguir es preciso que consideremos en primer lugar el hecho de que el contrato fue refrendado en Puerto Rico. ¿Qué razón medió para que así se hiciera y cuál es su efecto? Examinados los estatutos vigentes a la fecha en que se llevó a efecto la contrata, encontramos que la sección 21 de la Ley Núm. 66 de 16 de julio de 1921 (26 L.P.R.A. sec. 911) establece que "[n]inguna compañía de seguros extranjera hará negocios de seguros de personas residentes

---

[2] Refrendar significa, según el Diccionario de la Real Academia, autorizar un despacho u otro documento por medio de la firma de persona hábil para ello.

en Puerto Rico o de propiedades radicadas en el Estado Libre Asociado a no ser por mediación de un agente autorizado por dicha compañía, residente en Puerto Rico, *que refrende las pólizas . . ."* [Énfasis suplido.] Vemos, pues, que por disposición de ley, la refrendada era necesaria para la validez del contrato de seguro en esta jurisdicción.[3]

¿Tenía poder la Asamblea Legislativa para exigir que toda póliza debía ser refrendada por el agente en Puerto Rico de la compañía que la expidió con el obvio propósito de que el último acto necesario para darle validez al contrato se ejecutara en esta jurisdicción? Parece pertinente apuntar que se ha sostenido que se considera que un contrato de seguro se ha celebrado, para fines de aplicabilidad de ley, en aquel estado donde ha sido refrendado. *Lumbermans Mut. Casualty Co.* v. *Blake,* 47 A.2d 874 (N.H. 1946); *New York Life Ins. Co.* v. *Bonnasso,* 2 S.E.2d 260 (W.Va. 1939); 12 *Appleman, Ins. L. & P.,* § 7088 (ed. 1943). Establecido lo que antecede procede que consideremos ahora la validez de la disposición legal antes transcrita.

En el caso de *Osborn* v. *Oglin,* 310 U.S. 53 (1940) se consideró por el Tribunal Supremo de los Estados Unidos una disposición similar a la que aquí estudiamos y se concluyó que no ofendía precepto constitucional alguno. Se sostuvo que las leyes de un estado pueden tener repercusiones más allá de sus fronteras mientras no caigan dentro de la esfera prohibida por la Constitución. Y disposiciones como la nuestra no transgreden esa limitación. El negocio de seguros siempre se ha considerado como investido de interés público que justifica la intervención del estado en su reglamentación. Los siguientes casos han sostenido la validez constitucional de diversas formas de reglamentación del negocio de seguros

---

[3] El Código de Seguros vigente conservó esta disposición. Código de Seguros art. 3.290, Ley Núm. 77 de 19 de junio de 1957 (26 L.P.R.A. sec. 329) pero dio un paso más al disponer que cualquier disposición en un contrato al efecto de que se regiría por las leyes de otro estado no es válida. Id. art. 11. 190 (26 L.P.R.A. sec. 1119).

por los estados contra ataques al efecto de que violentaban la cláusula del debido proceso de ley de la Enmienda XIV. *Hooper* v. *California,* 155 U.S. 648 (1895) ; *Orient Insurance Company* v. *Daggs,* 172 U.S. 557 (1869) ; *Nutting* v. *Massachusetts,* 183 U.S. 553 (1902) ; *Carroll* v. *Greenwich Insurance Co.,* 199 U.S. 401 (1905) ; *Northwestern Life Ins. Co.* v. *Riggs,* 203 U.S. 243 (1906) ; *Whitfield* v. *Aetna Life Ins. Co.,* 205 U.S. 489 (1907) ; *German Alliance* v. *Hale,* 219 U.S. 307 (1911) ; *German Alliance Ins. Co.* v. *Lewis,* 233 U.S. 389 (1914) ; *Mountain Timber Co.* v. *Washington,* 243 U.S. 219 (1917) ; *La Tourette* v. *McMaster,* 248 U.S. 465 (1919) ; *National Ins. Co.* v. *Wanberg,* 260 U.S. 71 (1922) ; *Merchant Liability Co.* v. *Smart,* 267 U.S. 126 (1925) ; *O'Gorman & Young* v. *Hartford Ins. Co.,* 282 U.S. 251 (1931) ; *Hardware Insurance Co.* v. *Glidden Co.,* 284 U.S. 151 (1931) ; *Life & Casualty Ins. Co.* v. *McCray,* 291 U.S. 566 (1934) ; *Hoopeston Co.* v. *Cullen,* 318 U.S. 313 (1943) ; *State Farm Ins. Co.* v. *Duel,* 324 U.S. 154 (1945) ; *Robertson* v. *California,* 328 U.S. 440 (1946) ; *Daniel* v. *Family Ins. Co.,* 336 U.S. 220, (1949).

En *Hoopeston Co.* v. *Cullen,* 318 U.S. 313 (1943) se consideró específicamente una exigencia similar a la contenida, en nuestra ley al efecto de que toda compañía de seguro debía tener un agente autorizado que refrendara las pólizas. Al resolver la cuestión y determinar sobre su validez el Tribunal Supremo se expresó así:

"Las disposiciones que exigen tener una oficina en el estado y que los contratos sean refrendados por un agente en el propio estado no son más onerosas que las que fueron sancionados en, *La Tourette* v. *McMaster,* 248 U.S. 465 (1919)."

Establecida la validez de la disposición que exige la refrendada estaríamos en posición de adoptar la doctrina expuesta en los casos antes citados que sostienen que la ley. a aplicarse es aquella donde ocurrió el último acto que le da validez al contrato.

Pero es que independientemente de la cuestión técnica que acabamos de considerar, en *Hoopeston* se descartaron teorías conceptualistas del "lugar de contratación" en el campo de seguros como limitación al poder de un estado para proteger sus ciudadanos, enfatizándose que el acto de expedir una póliza es sólo un paso intermedio y que son las futuras consecuencias del contrato el verdadero objeto de la contratación. Ya hemos visto que en el caso de autos las actuaciones en Pittsburgh fueron preliminares y efímeras. Al solicitar el representante de la demandada el seguro en Pittsburgh, residía en Puerto Rico, la corporación era doméstica, el contrato cuyo cumplimiento se afianzaba se ejecutaría totalmente aquí; el beneficiario de dicho seguro era una de nuestras agencias gubernamentales. El hecho de que la prima correspondiente al primer año se hiciera efectiva en Pennsylvania carece de importancia. *Zogg* v. *Penn Mutual Life Insurance Company*, supra. Nota, 27 Brooklyn L. Rev. 144 (1960).

■ Estas circunstancias justifican la aplicación de las leyes de Puerto Rico al contrato, igual que lo hizo el Tribunal Supremo de los Estados Unidos al aplicar las leyes de Nueva York al contrato envuelto en el caso de *Hoopeston*. Esta doctrina se conoce como la del "centro de gravedad" que sostiene que la ley del estado que tiene más contacto con la cosa objeto del contrato es la aplicable, ya que se presume que ese estado es el que más interés tiene en cualquier cuestión que surja relacionada con dicho contrato. *Travelers Health Assn.* v. *Virginia*, 339 U.S. 643 (1950); *Hoopeston Co.* v. *Cullen*, supra; *Zogg* v. *Penn Mutual Life Insurance Company*, supra; *Kievit* v. *Loyal Protective Life Ins. Co.*, 170 A.2d 22 (N.J. 1961); *Auten* v. *Auten*, 124 N.E.2d 99 (N.Y. 1954). Nota 74 Harv.L.Rev. 357, 378 (1960).

■ Adoptar esta doctrina es realmente la tendencia de los tribunales en los casos de contratos de seguros. Se justifica por el interés que tiene el estado de proteger a sus ciudadanos ya que en el contrato de seguro, el asegurado normalmente

tiene que aceptar lo que propone la compañía. No está en posición de exigir mejores términos. Los acepta, o no obtiene la póliza. De ahí, que a esta clase de contratos se les denomine contratos de "adhesión". Lo explica así Castán:

"La moderna doctrina, a partir de Saleilles, viene llamando contratos de adhesión a aquellos en que el contenido, esto es, las condiciones de la reglamentación son obra de una sola de las partes, de tal modo que el otro contrayente no presta colaboración alguna a la formación del contenido contractual, quedando así sustituida la ordinaria determinación bilateral del contenido del vínculo por un simple acto de aceptación o adhesión al esquema predeterminado unilateralmente.

" 'Viene ligada esta especie de contratos al fenómeno económico de la posición privilegiada que, por diversos motivos (por ejemplo, para poderse ejercitar un monopolio de derecho o de hecho), tiene una de las partes respecto de la otra. En este sentido, define Messineo al contrato de adhesión como aquel en que se actúa, por parte del *contrayente económicamente más fuerte,* la imposición de determinadas cláusulas o del completo esquema del contrato, en sentido ventajoso para él y en detrimento del otro contrayente, el cual, siendo *económicamente más débil,* no tiene libertad de escoger, sino entre aceptar aquellas cláusulas o aquel esquema, o renunciar a la celebración del contrato. Manuale, 6ta. ed., vol. II, pág. 340.' " 3 Castán, Derecho Civil Español, pág. 332 (ed. 1954). (Bastardillas nuestras.)

En los Estados Unidos se le conoce como "adhesion contracts" [4] y los han definido así: "contratos en los cuales la intervención de una de las partes consiste en su mera conformidad, involuntaria y muchas veces sin conocimiento real de los términos de un documento redactado unilateralmente y forzado a aceptarlo generalmente por una empresa poderosa." Ehrenzweig, *Adhesion Contracts,* 53 Colum. L.Rev. 1072, 1075 (1953). Véase además Ehrenzweig, *Contracts in the Conflict of Laws,* 59 Colum. L. Rev. 973 (1959).

---

[4] El término "contratos de adhesión", usado en España y en los Estados Unidos tiene su origen común en la obra de Raymond Saleilles "De La Declaration de Volonté" (1901) donde acuñó la frase "contrat d'adhésion". Véase Ehrenzweig, *Adhesion Contracts,* 53 Colum.L.Rev. 1072 (1953) escolio 17.

Sobre las tendencias prevalecientes en cuanto a qué ley se aplica a los contratos de seguro se dijo en *Zogg*, arriba citado, lo siguiente:

"... La posición del demandado es que la formalización del contrato en Massachusetts exige que se considere a la ley de ese estado como el *locus contratus*. No es necesario que consideremos hasta qué punto esta regla de 'escoger la ley' puede hoy en día considerarse como de aplicación general en el campo de los contratos. Sólo debe notarse que en el área de los contratos de adhesión, particularmente en el campo de seguros, cualesquiera generalizaciones en cuanto a una regla de mayoría, o la preferida, es susceptible de constituir más que una simplificación que puede confundir. Cf. Ehrenzweig, *Contracts in the Conflict of Laws*, 59 Colum. L. Rev. 973, 986, 1014 (1959). Aquellas decisiones que tratan sobre la aplicación de las leyes de seguros de los distintos estados a transacciones que incluyen actos que han tenido lugar en otros estados resultan incompatibles, en términos de cualquier teoría uniforme, en el derecho internacional privado. De poder vislumbrarse alguna norma en estos casos, es la de que el foro aplique su propia ley a los contratos de adhesión de seguros otorgados por sus residentes. Véase Lenhoff, *Conflict Avoidance in Insurance*, 21 Law & Contemp. Prob. 549, 551–552 (1956)."

■ Es claro, pues, que procede adoptemos en esta jurisdicción la doctrina que sostiene la aplicación de las leyes del estado que tiene más contacto, relación más estrecha con el contrato, por el enorme interés que tiene éste en proteger los intereses de sus ciudadanos. Lo razonable de la doctrina que ahora adoptamos puede demostrarse mejor si consideramos los hechos de este caso. Si tal como lo hizo el juez de instancia le aplicamos al contrato objeto de este pleito la ley del estado donde se firmó la fianza y se pagó la primera prima, estaríamos ayudando a las compañías de seguros a evitar que se le aplicaran a contratos relacionados con Puerto Rico, los tipos aprobados para esos contratos por el Comisionado de Seguros. Las compañías aseguradoras rehusarían, dada su posición de ventaja, expedir pólizas en Puerto Rico, tal como

568

se hizo en el presente caso, y el interesado tendría que ir a otro estado para allí obtener la póliza que aquí se le negó, viniendo obligado a pagar los tipos allá prevalecientes. Se convertiría entonces en ilusorio el poder de reglamentar los tipos que deben prevalecer en Puerto Rico. Se destruiría toda la estructura creada por la Asamblea Legislativa en el Código de Seguros con el propósito de fomentar el bienestar público mediante la reglamentación de tipos de seguros con el fin de que éstos no sean excesivos, inadecuados ni injustamente desiguales. Código de Seguros, art. 12.010 (26 L.P.R.A. sec. 1201). Esto indudablemente tendría efectos adversos en nuestra economía.

Erró, pues, el tribunal de instancia al concluir que las leyes de Pennsylvania se aplican al contrato objeto de este litigio. *Se revocará la sentencia recurrida y se devolverá el caso para ulteriores procedimientos compatibles con los principios enunciados en esta opinión.*