FEDERAL INSURANCE COMPANY, demandante y recurrida, *v.* DRESSER INDUSTRIES, INC. y/o DRESSER–IDECO DIVISION, WORLD WIDE TOWER SERVICE y PAULSEN WIRE ROPE CORP., demandadas, peticionarias las dos primeras.

*Número:* O-80-659      *Resuelto:* 22 de mayo de 1981

*Brown, Newsom & Córdova* y *Hernando A. Rivera,* abogados de la peticionaria; *Segurola, Montalvo & Lugo,* abogados de la recurrida.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

La peticionaria Dresser Industries, Inc. ("Dresser") se obligó contractualmente a construir una torre de trasmi-

sión para WAPA–TV Broadcasting Corporation ("WAPA–TV"). Dresser garantizó por tres años los materiales, el equipo, la construcción y otros servicios a prestarse por ella bajo el contrato y sus estipulaciones. Se acordó que la torre contendría un ascensor de determinado tipo. La torre de trasmisión y la instalación del ascensor se concluyeron en el mes de junio de 1966.

El 29 de abril de 1976, WAPA–TV demandó a Dresser en Tejas por alegados vicios de construcción en la torre. El pleito se transó y WAPA–TV acordó relevar a Dresser de responsabilidad por reclamaciones pasadas o futuras concernientes al contrato de construcción aludido. La disposición pertinente del relevo proveía:

[WAPA] . . . does hereby release . . . [Dresser] . . . from any and all claims, demands, actions and causes of actions of whatever kind or character which WAPA may have or hereafter have growing out of or connected in anywise with the matters and things set forth and alleged by Plaintiff in its pleadings in the above entitled and numbered civil action, or which could be alleged therein by amendment or supplement, and especially from any claims and demands for property damage, failure to comply with drawings, plans and specifications, failure to build a safe tower, failure to afford a proper foundation, improper design, improper construction, failure to properly compute concrete stress . . . misrepresentation, breach of contract, breach of express or implied warranties, and any and all other failures, inadequacies of construction and detriments whether or not same have been discovered and repaired by WAPA or anyone else . . . resulting from the design, construction . . . or installation of a broadcasting tower. . . .

El relevo se otorgó en Tejas el 6 de julio de 1977.

El 29 de agosto de 1978, doce años después de la construcción de la obra, cayó al piso el ascensor al quebrarse un cable. La Federal Insurance Co., aseguradora de WAPA, demandó a Dresser en julio de 1979 por los daños al elevador. Dresser presentó una moción de sentencia sumaria en que reclamó que la acción estaba prescrita

y, además, que el relevo a que hemos hecho referencia constituía un impedimento a la demanda. El Tribunal Superior denegó la moción y Dresser recurrió en alzada a este foro. Dictamos orden de mostrar causa por la cual no debe revocarse la orden del tribunal de instancia.

Estos simples hechos plantean un torrente de cuestiones. ¿Qué es un "edificio" dentro del significado del Art. 1483 del Código Civil? ¿Está incluida la instalación de un elevador en la garantía decenal? La instalación de un ascensor defectuoso o la instalación defectuosa de un ascensor, ¿constituye un "vicio de construcción"? ¿Qué quiere decir el término "ruina" del Art. 1483? ¿Entraña la caída de un ascensor la ruina del edificio? ¿Qué efecto tiene sobre este caso la transacción por las partes en Tejas? ¿Bajo qué derecho se debe decidir esta cuestión, bajo el de Puerto Rico o el de Tejas? ¿Cuál es el plazo prescriptivo aplicable a este pleito, el de diez o el de quince años? ¿Qué significa a tal respecto el segundo párrafo del Art. 1483? Examinemos estos problemas.

1. *Significado del término "edificio". El caso de las instalaciones.*

El Art. 1483 de nuestro Código Civil, equivalente exacto del Art. 1.591 del Código Civil Español, dispone:

> El contratista de un edificio que se arruinase por vicios de la construcción responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.
>
> Si la causa fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince años.

La voz "edificio" ha recibido acepciones diferentes en distintos países donde la responsabilidad de los contratistas y arquitectos se rige por disposiciones relativamente análogas. En el derecho español, los comentaristas se inclinan a una concepción amplia del vocablo. La clara tendencia es

a expandir los presupuestos de la responsabilidad decenal, pero dentro de ciertos límites. J. Cadarso Palau, *La Responsabilidad Decenal de Arquitectos y Constructores*, Madrid, Ed. Montecorvo, 1976, pág. 124. Se ha argumentado, por ejemplo, que el término "edificio" abarca todo género de construcción adherida al suelo (casas, fábricas, puentes, carreteras, diques, campos de deportes, etc.). Cadarso Palau, *op. cit.*, pág. 112; G. García Cantero, *La responsabilidad por ruina de los edificios ex artículo 1.591 del Código civil*, 16 Anuario de Derecho Civil 1053, 1102 y ss. (1963). Esta definición no es enteramente satisfactoria. ¿Se extiende la responsabilidad decenal a edificaciones puramente provisionales? ¿Y a obras de naturaleza menor? Un contratista, ¿construye o instala un sistema de aire acondicionado, un ascensor?

■ Respecto a la primera pregunta, debe advertirse que la norma sentada por el Art. 1591 español, cuyas raíces se remontan al derecho romano y al de Castilla,[1] se refiere a todas luces a obras de larga duración. De ahí que la extensión del término "edificio" a construcciones como torres de trasmisión, que no es una obra provisional, es entendible y aceptable. Cadarso Palau, *op. cit.*, pág. 119. Dentro de un contexto moderno se estarían sirviendo los mismos intereses que provocaron en primer lugar el reconocimiento del principio.

En lo que toca a si cabe establecer una diferencia entre obras mayores y menores, tal como se hace en el derecho francés, Mazeaud et Mazeaud, *Traité Théorique et Pratique de la Responsabilité Civile*, 6ta ed., París, Ed. Montchrestien, 1978, T. II, pág. 94 y ss., el derecho español no reconoce la distinción. Algunos autores la favorecen. Scaevola, por ejemplo, ha escrito que "el plazo de diez

---

[1] El *Codex Justinianus* (393 A.D.) establecía un plazo de quince años para responder por vicios de construcción. Al mismo efecto: Partida 3, Tít. 32, Ley 21; Partida 5, Tít. 8, Ley 16. Véase: J. Herrera Catena, *Responsabilidades en la construcción*, Granada, Gráficas del Sur, 1974, Vol. 1, pág. 4 y ss.

años, que aun en construcciones mayores resulta excesivo, es extraordinario y abusivo en construcciones menores". Q. M. Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1951, T. XXIV, Vol. II, pág. 97. El problema que plantea Scaevola ha aguardado hasta ahora por una solución legislativa. Es innecesario que nos pronunciemos ahora sobre este problema, sin embargo, ya que la construcción e incorporación de un ascensor a un bien inmueble es, de todos modos, una obra mayor.

■ Finalmente, ¿incluye el vocablo "edificio" los aparatos mecánicos, o eléctricos o de otro orden, aun construidos por otros, que se instalen e incorporen al inmueble? En derecho español la contestación es que sí. Se extiende la responsabilidad decenal a ascensores, tuberías e instalaciones análogas. Sentencia de 18 de marzo de 1961. Herrera Catena, *op. cit.*, Vol. I, págs. 246–49; Vol. II, págs. 149–51.

En Francia, antes del Decreto de 22 de diciembre de 1967, los tribunales consideraban los ascensores como obras mayores, sujetos a la responsabilidad decenal. Mazeaud et Mazeaud, *op. cit.*, pág. 95. El Art. 13 del referido decreto dispone, sin embargo, que "No son considerados como obras los aparatos mecánicos o eléctricos que el empresario instale en el estado en que le son entregados". Herrera Catena, Vol. I, págs. 124–25; Mazeaud et Mazeaud, Vol. II, pág. 134.

En Italia, la responsabilidad decenal no cubre los ascensores, ya que no se les considera "edificios", sino accesorios de edificios. D. Rubino, *Dell' Appalto*, Roma, Soc. Ed. del Foro Italiano, 1969, pág. 289.

■ Preferimos la solución española. Estimamos que tal solución cumple mejor los propósitos de orden público del Art. 1483 en casos como el presente en que el artefacto instalado es parte importante de la obra y queda incorporado al inmueble. El buen funcionamiento de los ascensores de una construcción moderna, y el de otros aparatos

y objetos análogos, es a veces de importancia tan fundamental al dueño como la evitación de otros vicios. Cuando la instalación es la de una nevera, una máquina de lavar platos y otros muebles que no son incorporados al inmueble en forma tan íntima y permanente ni son partes tan directamente relacionadas con el edificio en sí, sería desproporcionado extender a tales casos la responsabilidad decenal. Basta con la protección que ofrecen los principios de la compraventa. Mazeaud et Mazeaud, *op. cit.*, Vol. II, pág. 134.

2. *Significado del término "ruina".*

■ La doctrina y la jurisprudencia han ido enanchando a través de los años el vocablo "ruina" empleado en nuestro Art. 1483 y sus muchos antecedentes. La ruina no tiene que afectar la subsistencia de la construcción. Scaevola, *op. cit.*, pág. 99; Sentencia de 20 de noviembre de 1959 (Esp.). La responsabilidad decenal cubre no sólo la ruina actual, sino la amenaza o el peligro de ruina. Cadarso Palau, *op. cit.* pág. 127 y ss.; Sentencia de 20 de noviembre de 1959 (Esp.). También se ha extendido a la llamada ruina funcional. Sentencia de 15 de noviembre de 1970 (Esp.); Sentencia de 28 de noviembre de 1970 (Esp.). Algunos autores han aconsejado cautela en la ampliación *ad infinitum* del término "ruina". Cadarso Palau, *op. cit.*, pág. 131, ha señalado que:

Se observa, en este punto, una tendencia a extender el ámbito de la responsabilidad decenal a supuestos en los que ya no está comprometida la subsistencia misma del edificio en su solidez o estabilidad. Teniendo en cuenta la paralela tendencia a ampliar la noción misma de edificio (hasta comprender elementos no integrantes de la estructura misma), cabe preguntar si la responsabilidad decenal no ha dejado ya, en buena medida, de ser entendida como un instituto singular y exorbitante en su misma base y fundamento.

■ Debido a todas luces a preocupaciones de esta índole es que se han erigido criterios condicionales para

determinar la ruina funcional. Los vicios de construcción deben causarle perjuicio considerable al propietario, o deben comprometer la seguridad pública, o deben tornar la obra en impropia para el uso a que se le iba a destinar, o deben exceder la medida de las imperfecciones que cabe esperar en una construcción. Herrera Catena, Vol. I, pág. 263. Todos estos criterios son susceptibles de interpretaciones diversas, conforme con la tabla de valores que se adopte. Son tan extensos los cambios experimentados durante el último siglo en el peso respectivo de los intereses envueltos y tan variadas las interrogantes que plantea el Art. 1483 hoy día que quizás sea conveniente que el cuerpo legislativo siente las pautas que a su juicio exijan las circunstancias actuales. Hasta tanto el órgano legislativo decida pronunciarse, los tribunales tendrán que seguir interpretando este antiguo texto con la más escrupulosa atención al logro de una debida armonía entre los intereses en juego, reconociendo que los criterios expuestos deben emplearse con el debido equilibrio y cautela, a fin de no ampliar el término "ruina" hasta el punto de abarcar casi todo orden de defectos de construcción.

■ Aun bajo el supuesto de que determinados defectos entrañen la "ruina" del edificio, ello no equivale a la imposición de responsabilidad al contratista. La Sentencia de 15 de febrero de 1972 (Esp.) negó la imposición de responsabilidad por filtraciones y goteras producidas en el techo de un garaje tras la instalación de un jardín, una vez que no se estimó probado que los efectos dañosos, filtraciones y goteras, aun admitiendo la amplitud del concepto de ruina, fuesen debidos a vicios de la construcción . . . ." *Cf. Géigel* v. *Mariani,* 85 D.P.R. 46 (1962); *Pereira* v. *I.B.E.C.,* 95 D.P.R. 28 (1967).

■ En el caso de autos, la caída del ascensor cabe ciertamente dentro del concepto de "ruina". Causó considerable perjuicio. Comprometió la seguridad pública. Excedió la medida de las imperfecciones que cabe esperar

en una construcción. Si la caída se debió o no a un vicio de construcción, si se da aquí el elemento de causalidad necesario para la imposición de responsabilidad, es algo que discutiremos más tarde.

3. *El efecto de la transacción del primer caso.*

a) *El derecho aplicable.*

■ Tanto el Código Civil español de 1889 como el puertorriqueño guardaron silencio sobre la norma de derecho internacional privado aplicable a la reglamentación sustantiva de las obligaciones contractuales, aunque el derecho español anterior contenía normas sobre el particular.[2] Se ha gozado así en España y Puerto Rico, hasta la aprobación, en el primer caso, del nuevo título preliminar (1975), de suma libertad en el diseño del derecho aplicable. Se ha argumentado por varios que la regla más adecuada es la del lugar donde se celebra el contrato (la *lex loci contractus* o la *lex loci celebrationis*). Otros apoyan la norma de la autonomía de la voluntad; otros tal norma, mas con limitaciones; algunos la regla vigente en el sitio de ejecución del contrato (*lex loci executionis*).[3]

El Art. 10.5 del nuevo Título Preliminar (1975) del Código Civil dispone:

Se aplicará a las obligaciones contractuales la ley a que las partes se hayan sometido expresamente, siempre que tenga alguna conexión con el negocio de que se trate; en su defecto, la ley nacional común a las partes; a falta de ella, la de residencia habitual común, y, en último término, la ley del lugar de celebración del contrato.

No obstante lo dispuesto en el párrafo anterior, a falta de sometimiento expreso, se aplicará a los contratos relativos a bienes inmuebles la ley del lugar donde estén sitos, y a las compraventas de muebles corporales realizadas en establecimientos mercantiles, la ley del lugar en que éstos radiquen.

---

[2] *Comentarios a las Reformas del Código Civil,* Madrid, Ed. Tecnos, 1977, Vol. I, pág. 520 y ss.; A. Miaja de la Muela, *Derecho internacional privado,* 7ma ed., Madrid, 1976, T. 2, pág. 220 y ss.

[3] *Comentarios a las Reformas del Código Civil, loc. cit.*

■ Aun de adoptarse por Puerto Rico, vía la aplicación del Art. 7 de nuestro Código Civil, la norma española, la ley aplicable a este caso es claramente la puertorriqueña y no la tejana. Las partes no hicieron expresión específica en el contrato entre ellos de su voluntad de que la transacción se rigiese por la ley de Tejas. Aun de haberlo hecho, la doctrina de la autonomía de la voluntad está limitada, entre otros factores, por consideraciones de orden público, las que impedirían en este caso, según se discute en el apartado siguiente, que se acortasen los términos que dispone el Art. 1483 o que se renunciase a los beneficios totales de esta disposición. El segundo párrafo del Art. 10.5 sería, además, el que nos concerniría bajo la hipótesis que estamos considerando. Bajo tal párrafo habría que aplicar la *lex loci rei sitae*, lo que de nuevo significa la ley de Puerto Rico.

■ En Puerto Rico, no obstante, nos hemos inclinado a favorecer un enfoque funcional que evite, aunque se sacrifique certeza en la aplicación, reglas formales como la representada por la *lex loci celebrationis*, la *lex loci executionis*, la *lex patriae*, la *lex domicilie* y la *lex sitae*. A tal efecto, hemos utilizado, con la debida flexibilidad y el reconocimiento de la gran variedad existente de obligaciones contractuales, el principio de los contactos dominantes. Véanse: *Vda. de Fornaris* v. *Amer. Surety Co. of N.Y.*, 93 D.P.R. 29 (1966); *Maryland Cas'y Co.* v. *San Juan Rac'g Assoc., Inc.*, 83 D.P.R. 559 (1961); *Green Giant Co.* v. *Tribunal Superior*, 104 D.P.R. 489 (1975). No percibimos circunstancias especiales de ninguna naturaleza que aconsejen la inaplicabilidad a este caso de la doctrina de los contactos dominantes. Bajo esta teoría no cabe duda que la ley aplicable es la de Puerto Rico. A excepción de la circunstancia aislada de la transacción del pleito en Tejas, todos los contactos significativos son con este foro.

b) *La irrenunciabilidad de los plazos establecidos por el Art. 1483.*

Todo acuerdo de renuncia o acortamiento del plazo decenal es nulo por razones de orden público. Scaevola, *op. cit.*, pág. 111; *González* v. *Agostini*, 79 D.P.R. 510, 518 (1956). Las mismas razones que apoyan esta regla en el caso del plazo decenal la respaldan en el caso del plazo de quince años a que se refiere el último párrafo del Art. 1483. La norma de irrenunciabilidad es aún más imperativa en esta última situación, ya que su naturaleza primitiva se ha reconocido generalmente. Herrera Catena, Vol. II, pág. 10. La limitación de la garantía a tres años efectuada por el contratista es, en consecuencia, nula.

### 4. *El problema de la prescripción.*

La ruina del ascensor ocurrió a los doce años de concluir la construcción. La acción está prescrita, a menos que se aplique a este caso el plazo de quince años a que alude el segundo párrafo del Art. 1483, para lo que es necesario probar que la causa de la ruina fue "la falta del contratista a las condiciones del contrato".

El segundo párrafo del Art. 1.591 del Código Civil Español enuncia un principio totalmente desconocido en la generalidad de otros códigos civiles. No existía tal concepto ni en el propio proyecto de Código Civil de 1851. Su razón de ser y aun su significado representa un enigma para muchos comentaristas. Scaevola ha escrito despectivamente que el segundo párrafo "no [ha] servido para otra cosa que para demostrar que cuando se redactó el inciso estaba interrumpida la corriente mental entre el cerebro y la pluma del redactor". *Op. cit.*, pág. 117. Véase: Herrera Catena, *op. cit.*, Vol. II, pág. 12 y ss. La interpretación más generalizada es que se trata de una excepción punitiva al plazo decenal. Herrera Catena, *op. cit.*, Vol. II, pág. 9.

Resulta claro que el segundo párrafo del Art. 1483 tiene una acepción muy restringida. De considerarse, por el contrario, que la violación de una cláusula general de

garantía, expresa o implícita, al efecto de que se construirá bien, basta para invocar el párrafo segundo ¿qué diferencia habría entre el plazo decenal y el de quince años?

▆▆▆▆▆ Resolvemos que para poder invocar el plazo de caducidad mayor deberá probarse que la violación a una cláusula concreta del contrato o sus especificaciones fue la causa directa de la ruina del edificio. La carga de la prueba le corresponde al dueño o legitimado activo. Herrera Catena, Vol. II, pág. 146. En el caso de autos, el contrato entre las partes especificaba las condiciones que tenía que cumplir el ascensor (A-37-38). El dueño tiene que probar que el ascensor se construyó o instaló contrario a alguna de las especificaciones y que tal falta fue la causa del accidente y no la falta de mantenimiento u otro acto u omisión imputable al propietario. Por tratarse de una cláusula punitiva, que tiene el extraordinario efecto de ampliar el plazo decenal, la prueba no podrá fundarse en simples inferencias derivables de la caída del ascensor. La falta del contratista tiene que ser probada por el comitente. El comitente no ha tenido tal oportunidad.

*Por las razones expuestas, la emisión de una sentencia sumaria en esta etapa de los procedimientos es improcedente. Se confirmará la resolución recurrida y se devolverá el caso a instancia para procedimientos ulteriores consistentes con esta opinión.*

El Juez Asociado Señor Negrón García concurre con el resultado sin opinión.