# 2004 DTA 138

**TRIBUNAL DE CIRCUITO DE APELACIONES
REGION JUDICIAL DE GUAYAMA
PANEL IX**

FARMACIAS DERKES CORPORATION, LCDO. ENRIQUE SUED JULIA
Recurridos

v.

PCS, INC.
Peticionaria

Núm. KLCE-04-00528

San Juan, Puerto Rico, a 9 de septiembre de 2004

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Aponte Jiménez y Salas Soler

Pesante Martínez, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos la parte peticionaria, Advance PCS (en adelante, "*PCS*"), quien interesa la expedición de un auto de *certiorari* y la revocación de una resolución emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, "*TPI*") de 9 de marzo de 2004. ■ Mediante dicho dictamen reiteró que la cláusula de arbitraje contenida en el contrato suscrito entre las partes contravenía la política pública del Estado Libre Asociado, por lo que la declaró nula. El TPI entendió que la cláusula de arbitraje en el estado de Arizona era contraria al orden público "*porque el foro seleccionado resulta ser irrazonable e injusto*". ■ Añade que "*de ventilarse el caso en dicho foro, incurriría en una clara y patente inequidad que derrotaría la política pública del Estado con respecto a la salud del pueblo y a los principio [sic] fundamentales que rigen nuestra sociedad jurídica democrática*". ■ No le asiste la razón.

Por las razones que se exponen a continuación, se expide el recurso de *certiorari* solicitado y se revoca la resolución recurrida.

### II

El 23 de agosto de 2000, la parte recurrida, Farmacia Derkes y el licenciado Enrique Sued Juliá presentaron una acción por enriquecimiento injusto, daños y perjuicios contra PCS, mediante la cual, en esencia, alegaron que la recurrente se negó a pagarle a la Farmacia Derkes por concepto de medicamentos despachados a pacientes cuyos planes médicos se procesan a través de la red proveedora de PCS. Los recurridos señalaron que le facturaron a PCS por unos medicamentos que la Farmacia Rina había despachado durante 1993, 1994 y 1995 y que PCS se negó a pagar el costo y el margen de ganancias a que tenía derecho. Se alega que dicha acción de

Al cabo de varias mociones de prórroga para contestar la demanda instada en su contra, el 22 de enero de 2001, PCS presentó una solicitud de desestimación y paralización de los procedimientos. PCS planteó que existiendo en los contratos cláusulas de arbitraje que obligan a las partes a someter todas las controversias surgidas o relacionadas con los contratos a un procedimiento de arbitraje ante el foro acordado, procedía como cuestión de derecho que se desestimara o paralizara la acción hasta que las partes sometieran la controversia ante el foro que se acordó. En el mencionado escrito se argumentó que la cláusula de arbitraje en el contrato que suscribió la Farmacia Derkes-Sued con PCS establece que la sección del contrato que dispone para el arbitraje y los derechos de las partes han de ser gobernados por la Ley Federal de Arbitraje (*"Federal Arbitration Act"*). 9 U. S.C. sec. 1 *et seq.* Arguyó la parte recurrente que el contrato entre PCS y Farmacia Derkes contenía una cláusula dispositiva estableciendo que toda controversia entre las partes debe adjudicarse mediante un proceso de arbitraje en el estado de Arizona, E.E.U.U., razón por la cual la acción no debía proceder.

La parte recurrida se opuso a dicha solicitud arguyendo que el contrato entre las partes no tenía cláusula alguna aplicable al presente litigio, dado que un árbitro no podía conceder los remedios solicitados y que la cláusula de arbitraje en Arizona era nula por contravenir el orden público.

Con el transcurso de varios trámites procesales, el 19 de junio de 2003, el TPI dictó la primera de dos resoluciones. En esta ocasión, a modo de justificar su determinación, el foro señaló que la Farmacia Derkes era un negocio *"pequeño"*, contención que, según refiere la parte peticionaria, no encuentra base en las alegaciones ante la consideración de dicho foro, por lo que la litigación del asunto en un *"foro tan lejano"* alteraría *"el orden rutinario sobre el despacho de medicamentos en Puerto Rico"*. ■ Puntualiza el TPI que lo anterior tendría como consecuencia poner en peligro la salud del pueblo, por lo que declaró la mencionada cláusula como nula.

El 16 de julio de 2003, PCS presentó una solicitud de reconsideración. Mediante la misma, la parte recurrente alegó que las partes firmaron un contrato que obligaba a la Farmacia Derkes a litigar en el estado de Arizona la reclamación objeto del presente litigio. Para sustentar su reclamo, PCS expuso mediante fundamento al respecto la tendencia judicial a hacer valer los pactos de arbitraje. Los recurridos presentaron la correspondiente oposición y reiteraron su inconformidad con la cláusula de referencia contenida en el contrato suscrito entre las partes, ya que PCS sólo fungía en un papel de intermediario entre el paciente, la farmacia y la aseguradora o patrono del paciente. La parte recurrida entendió que el rol de PCS consistía en determinar qué medicina podía cubrir o no, le pagaba a la farmacia y le cobraba a la aseguradora o patrono del paciente. Añadió que la única manera en que la farmacia podía sufragar los costos del litigio en Arizona, supuestamente era aumentando los precios de sus medicamentos lo que traería como consecuencia un pago mayor por parte de los pacientes para costar sus medicinas.

Finalmente, y luego del transcurso de varios trámites procesales, el 9 de marzo de 2004, el TPI dictó una segunda y última resolución donde declaró no ha lugar la solicitud de reconsideración y se reiteró en su dictamen anterior; esto es, su declaración de nulidad de la cláusula de arbitraje en Arizona.

Insatisfechos con dicho curso decisorio, PCS acude ante nos y señala que el TPI erró de la siguiente manera:

*"ERRÓ EL [TPI] AL DECLARAR NULA Y POR NO PUESTA UNA CLÁUSULA QUE DISPONE QUE LAS CONTROVERSIAS QUE SURJAN DEL CONTRATO SE RESUELVAN MEDIANTE ARBITRAJE EN ARIZONA.*

*ERRÓ EL [TPI] AL DETERMINAR QUE LA CLÁUSULA DE ARBITRAJE EN ARIZONA ES CONTRARIA AL ORDEN PÚBLICO.*

*ERRÓ EL [TPI] AL DECLARAR NULA LA CLÁSULA DE SELECCIÓN DE FORO SIN QUE HUBIESE*

Analizado el expediente, expedimos el auto de *certiorari* solicitado y revocamos la resolución recurrida.

### III

Por estar íntimamente ligados, discutiremos en conjunto los tres planteamientos de error alegados por PCS.

El contrato que contiene la controvertida cláusula surge como parte de una relación entre tres partes que el resultado del servicio ofrecido es proveer acceso a los pacientes a sus medicamentos. En su oposición a la expedición del auto de *certiorari*, la parte recurrida Farmacia Derkes nos ofrece un recuento del esquema mediante el cual los pacientes obtienen el referido acceso a sus medicinas, el cual, por su especificidad, transcribimos a continuación:

*"De una primera parte, esta [sic] el paciente que acude con su plan médico a la farmacia para obtener las medicinas que le fueron recetadas. De una segunda parte esta [sic] la farmacia que es el custodio de los medicamentos y quien los despacha a los pacientes. Mientras el paciente espera, PCS recibe la información que le provee la farmacia acerca del plan médico del paciente y la medicina recetada; con esos datos, PCS determina si el plan médico cubre la medicina y el por ciento (%) de deducible, si alguno, que pagará al paciente. De acuerdo a la autorización de PCS, la farmacia despacha los medicamentos al paciente. Posteriormente, PCS le paga a las farmacias por los medicamentos despachados."* ■

En la acción instada ante el TPI, la Farmacia Derkes y el licenciado Sued Juliá reclaman el pago de cientos de medicamentos que alegadamente la farmacia despachó a pacientes cuyos planes médicos son administrados por PCS. Los recurridos indicaron que a pesar de que despacharon los medicamentos correctamente, PCS se niega a pagarle los mismos.

La relación contractual entre la Farmacia Derkes y PCS se rige por un contrato intitulado *"PCS Health Services Provider Agreement"*. En específico, la cláusula 9.5 del referido contrato establece que **toda controversia contractual entre las partes debe ser dilucidada en un procedimiento de arbitraje en el estado de Arizona, E.E.U.U.** ■ Además, la cláusula dispone que el árbitro sólo podrá conceder los remedios que se expresan en el contrato, que la decisión del árbitro será final y sólo un tribunal con jurisdicción, es decir, en este caso, el del estado de Arizona, podrá entender en un recurso apelativo.

Por su parte, la parte recurrida Farmacia Derkes y el licenciado Sued Juliá aludieron que procedía la desestimación del pleito porque el aludido contrato era uno de adhesión del cual no formaron parte en su creación y por lo oneroso, irrazonable e injusto que resultaba ser dilucidar las controversias mediante un proceso de arbitraje en Arizona, según establecido mediante la cláusula 9.5 del mencionado contrato. Dicho argumento fue avalado por el TPI y en apoyo a ello dictaminó que la referida cláusula contravenía el orden y la política pública con respecto a la salud del Estado. Así, declaró la cláusula como nula y la dio por no puesta mediante la resolución aquí recurrida. Los peticionarios solicitan la revocación de dicho dictamen y les asiste la razón. Veamos.

## A. La interpretación de los contratos

En Puerto Rico rige el principio de la libertad de contratación. *Unisys v. Ramallo*, 128 D.P.R. 842, 850 (1991). Como parte de esta norma, *"los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público"*. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. Una vez establecidas las cláusulas y condiciones del acuerdo, se entenderá perfeccionado el contrato por el consentimiento entre las partes y, desde ese momento, cada una de

ellas vendrá obligada no sólo a cumplir con lo expresamente pactado, sino también con las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. § 3375. Esa obligación de cumplir con lo pactado se funda en el principio de la buena fe, la cual exige no defraudar la confianza que otro ha puesto en una promesa o conducta. *Unisys v. Ramallo, supra*, a la pág. 852 (citando a L. Díez-Picazo, *Fundamentos de Derecho Civil Patrimonial*, 2da ed., Madrid, Ed. Tecnos, 1983, Vol. I, Cap. IV, pág. 99).

El Artículo 1044 de nuestro Código Civil, 31 L.P.R.A. sec. 2994, postula que *"...las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos"*. La norma en la interpretación de contratos consiste en presumir que el consentimiento prestado por las partes es válido. No obstante, el consentimiento será nulo si fue prestado por error, violencia, intimidación o dolo. Art. 1217 del Código Civil, 31 L.P.R.A. sec. 3404.

Como regla general, los contratos no requieren de interpretación cuando sus términos y condiciones son claras y no dan margen a ambigüedades o diferentes entendimientos, por lo que se estará al sentido literal de los mismos. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471, y si las palabras parecieran contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas. *Íd*. Las palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces. 31 L.P.R.A. sec. 15. El término se entiende claro cuando es suficiente en su contenido y su significado particular se puede entender sin lugar a duda. *Fernández Fernández v. Municipio de Bayamón*, 942 F. Supp. 89 (1996-D.P.R.). Sin embargo, cuando el contrato contenga cláusulas oscuras o ambiguas, por necesidad se activa la norma de interpretación contractual. Ambigua es una cláusula cuyo lenguaje parece ser claro, pero admite que se le imparta interpretaciones conflictivas. *J.R.T. v. Junta de Adm. del Muelle Municipal*, 122 D.P.R. 318, 331 (1988). En tales casos, ello no deberá favorecer a la parte que hubiese ocasionado la oscuridad. Art. 1240 del Código Civil, 31 L.P.R.A. § 3478.

Cónsono con lo anterior, llamamos contrato de adhesión aquél en que una sola de las partes dictó las condiciones del acuerdo. *López v. Atlantic Southern Ins. Co.*, opinión de 11 de febrero de 2003, **2003 J.T.S. 14**; *Maryland Cas'y Co. v. San Juan Rac'g Assoc., Inc.*, 83 D.P.R. 559, 566 (1961). En nuestra jurisdicción, los contratos de adhesión son tratados de modo especial, pero ello no significa que éstos deban ser siempre interpretados liberalmente en favor de la parte más débil y mucho menos que tales pactos estén viciados de nulidad. *Casanova v. P.R. Amer. Ins. Co.*, 106 D.P.R. 689, 697 (1978). La mera desigualdad económica entre las partes no hace que el contrato sea uno de adhesión, ya que lo usual es que las partes contratantes no están en igual posición económica. *Consolidated v. Cooley*, 103 D.P.R. 6, 9 (1974). Por consiguiente, **la adhesión tampoco implica o conlleva la nulidad del contrato**. *Casanova v. P.R. Amer. Ins. Co., supra*. **En ausencia de ambigüedad u oscuridad, el contrato de adhesión debe ser atendido según sus términos**. Cuando los términos y condiciones del contrato de adhesión son claros, específicos y no dan margen a diferentes interpretaciones, así deben aplicarse. *García Curbelo v. A.F.F.*, 127 D.P.R. 747, 760 (1991).

Explorada la trayectoria a seguir en cuanto a la interpretación de los contratos, debemos dilucidar la procedencia de los convenios de arbitraje contractuales de índole comercial, su interpretación y la aplicación de dicho análisis a la controversia planteada ante nos.

## B. La procedencia del arbitraje comercial pactado contractualmente

Nuestro análisis jurídico sobre el tópico tiende a indicar que existe interés por parte del Estado en promover métodos alternos de adjudicación como lo es la mediación y el arbitraje. *Crufon Construction v. AEP*, opinión de 11 de febrero de 2002, **2002 J.T.S. 24**, a la pág. 726; *Medina v. La Cruz Azul de P.R.*, opinión. de 30 de noviembre de 2001, 155 D.P.R.___(2001), **2001 J.T.S. 168**, a la pág. 497; *PaineWeeber, Inc. v. Service Concepts*, opinión de 13 de junio de 2000, **2000 J.T.S. 100**, a la pág. 1283. Ello, pues, la resolución por vías alternas al

trámite judicial resulta, entre otras cosas, en menos costos para los litigantes, así como una solución más rápida a las controversias litigiosas. La Ley Federal de Arbitraje, 9 U.S.C. sec. 1, *et seq.*, enuncia una política federal a favor del proceso de arbitraje. Sin embargo, esta política pública a favor del arbitraje no es absoluta, sino que tiene sus excepciones. *Medina Betancourt v. La Cruz Azul de P.R., supra.*

La citada legislación dispone que las cláusulas de arbitraje contenidas en los contratos interestatales son válidas, irrevocables y obligatorias. Esta legislación aplica tanto en los tribunales federales como en los estatales. *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352, 358 (1990), citando a *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

El arbitraje comercial en Puerto Rico está regulado por las disposiciones de la Ley Núm. 376 de 8 de mayo de 1951, 32 L.P.R.A. sec. 3201 *et seq.* Véase además: *Rivera v. Samaritano & Co., Inc.*, 108 D.P.R. 604, 606-607 (1979). Por su parte, el Artículo 1 de la Ley Núm. 379, *supra*, establece lo siguiente respecto a los convenios de arbitraje:

*"Dos o más partes podrán convenir por escrito en someter a arbitraje, de conformidad con las disposiciones de este Capítulo, cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de someter a arbitraje; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo. Tal convenio será válido, exigible e irrevocable, salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio."*

32 L.P.R.A. sec. 3201.

Dos o más partes podrán convenir por escrito en someter a arbitraje, de conformidad de las disposiciones de este Capítulo, cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de someter a arbitraje; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo. Tal convenio será válido, exigible e irrevocable, salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio.

La política pública imperante en torno al arbitraje está ligada a la doctrina de la autonomía de los contratantes enunciada en el Artículo 1207 del Código Civil de Puerto Rico, *supra*, sec. 3372. Así, pues, cuando dos personas establecen un pacto en el cual se comprometen a llevar a un foro arbitral las disputas que puedan surgir del mismo, los tribunales deben, como regla general, respetar la voluntad de las partes y hacer valer el acuerdo ordenando que el asunto se resuelva primero en arbitraje. *Medina v. La Cruz Azul, supra.*

El arbitraje contractual puede surgir tanto de una cláusula accesoria a un contrato principal mediante la cual las partes acuerdan someter a arbitraje sus desavenencias futuras o puede surgir de un convenio por escrito para resolver una controversia existente. *Rivera v. Samaritano & Co., Inc., supra.* Debido a que en Puerto Rico existe una fuerte política pública que favorece el arbitraje de controversias una vez acordado el arbitraje, los tribunales carecen de discreción y tienen que dar cumplimiento al arbitraje acordado. Más aún, cualquier duda sobre el alcance de las controversias que pueden ser llevadas a arbitraje debe ser resuelta a favor del arbitraje. *World Films, Inc. v. Paramount Pict. Corp., supra*, a las págs. 357-358; *National Railroad Passenger Corporation v. Boston and Maine Corporation*, 850 F. 2d. 756, 759 (D.C, Cir. 1988); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985); *McGregor-Doniger v. Tribunal Superior*, 98 D.P.R. 864, 869 (1970).

En *AT&T Technologies v. Communication Workers*, 475 U.S. 643, 650 (1986), el Tribunal Supremo Federal reafirmó lo establecido en *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960), a los efectos de que:

*"Where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."*

Recapitulando, existe un enfoque más favorable al arbitraje que refleja una actitud judicial de mayor confianza en la capacidad del arbitraje de rendir justicia. Por ende, existe un debilitamiento del argumento de la política pública como justificación para incumplir con un compromiso de arbitraje. Véase *Scherk v. Alberto Culver Co*, 417 U.S. 506 (1974); Helfeld, David M., *"La Jurisprudencia Creadora: Factor Determinante en el Desarrollo del Arbitraje en Puerto Rico"*, 30 Rev. Jur. U.P.R. 1, 30-31 (2001).

Una vez establecida la fuerte política a favor del arbitraje y que una cláusula puede ser parte de un contrato como el de autos, debemos proceder a dirimir si el contrato en controversia es de adhesión, si la presente cláusula resulta ser irrazonable e injusta y si atenta contra el orden público. Resolvemos en la negativa.

Según expusiéramos, la controversia ante nos gira en torno a discrepancias surgidas entre la recurrida Farmacia Derkes y la parte peticionaria PCS por motivo de alegados despachos de medicamentos a beneficiarios de diferentes planes médicos, clientes de PCS, dineros que la farmacia alega PCS se ha negado a pagar o reembolsarle.

El presente pleito tiene sus orígenes en el procesamiento de recetas a través del sistema de PCS. Para lograr acceso al sistema, es imperativo que haya habido un acuerdo para la utilización del mismo. Dicho contrato, una vez firmado por las partes participantes, autoriza y permite despachar los medicamentos. La información que se transmite por medios electrónicos desde Puerto Rico hasta Arizona autoriza la transacción y crea una reclamación a favor de la farmacia.

Añade PCS que, desde sus comienzos, se han dedicado a administrar para sus clientes las aseguradoras o planes médicos el área de beneficios de farmacia. Según PCS, su labor incluye recoger en una base electrónica de datos (*"main frame"*) localizada en Arizona la información relacionada con las personas con derecho a obtener beneficios de farmacia autorizados por aquellos planes que hayan contratado con ellos. En dicho *main frame* llegan diariamente múltiples reclamaciones que procesan las más de 50,000 farmacias y cadenas de farmacias que han contratado con ellos para proveer el servicio. PCS refiere que desde la localización central salen informes estadísticos, clínicos y salen cheques de pago a farmacias por los servicios que hayan prestado durante el ciclo. Así, con el cheque de pago se envía un desglose de las transacciones, del plan médico a que corresponden y allí se reflejan los ajustes de débito o crédito que se hicieran durante ese ciclo. Por otro lado, PCS le factura a sus clientes los planes para recobrar lo que ya le pagó a las farmacias, más un cargo por servicio.

Finalmente, PCS indicó que todos los servicios bajo una tarjeta autorizada PCS, no importa el lugar donde se presten, se procesan a través del mismo centro de cómputos y reclamaciones en donde de forma electrónica están archivadas todas las transacciones y de donde salen los pagos y la facturación. PCS aclaró que las farmacias en sus operaciones vienen obligadas, además de cumplir con los términos del contrato, a darle cumplimiento tanto a las leyes vigentes en el Estado Libre Asociado como a las de los Estados Unidos. La parte recurrente puntualizó que las farmacias son responsables de asuntos como la conservación de las recetas originales entregadas por pacientes-clientes, registros de firmas, cumplimiento con las normas aplicables al expendio de sustancias controladas y otras exigencias de igual envergadura que tienen varios propósitos como la protección de la salud y el bienestar general de los consumidores que acuden a las mismas en busca de servicios.

Informa la parte recurrente que el contrato o *"Provider Agreement"*, el cual es típico del negocio, le permite al organizador de la red ofrecerle a sus clientes los planes médicos y aseguradoras un amplio número de farmacias a donde los beneficiarios pueden acudir a obtener sus medicamentos. Entendemos que los planes médicos, de

antemano, pueden calcular con razonable certeza el monto de los cargos que le serán facturados por los servicios de medicina que reciben las personas que estén acogidas a su plan, ya que hay uniformidad entre los cargos que las farmacias pueden cobrar.

De los documentos que obran en el expediente, se desprende que la recurrida, libre y voluntariamente, hizo una solicitud para acogerse a la red, cuyo patente resultado fue el contrato firmado entre las partes, el cual contiene la controvertida cláusula. Recordemos que el cumplimiento de lo pactado está estrechamente vinculado con la buena fe de los contratantes. *Unisys v. Ramallo, supra.* El contrato que nos ocupa fue suscrito por las partes en el 1991. Doce años más tarde, acude la recurrida ante el foro judicial para impugnar la susodicha cláusula. Resolver en contrario equivaldría a dejar sin efecto todo un ordenamiento jurídico amparado en la libertad de contratación y la buena fe imperante que debe enmarcar toda relación contractual y que, a toda luz, permea en su totalidad el acuerdo que nos ocupa.

En lo que a la llamada inequidad se refiere, la parte que reclama la irrazonabilidad del foro seleccionado tiene el deber de establecerlo con prueba contundente. *Carnival Cruise Lines v. Shute et vin,* 499 U.S. 585 (1991). Cuando los términos de un contrato son claros y específicos y no dan margen para diversas interpretaciones, así deben aplicarse. *García Curbelo v. A.F.F.,* 127 D.P.R. 747(1991); *Unisys v. Ramallo, supra.*

Tal y como apreciamos, el contrato dispone en términos específicos y claros cómo y dónde habrán de dilucidarse todas las controversias relacionadas con o que surjan de la relación entre las partes. Colegimos que no hay margen a duda ni a interpretaciones conflictivas, así como tampoco quedó derrotada la validez de la cláusula de la selección del foro. Concluimos que quedó demostrado que hay contactos sustanciales entre la jurisdicción acordada, el contrato y las partes. Hay una fuerte política pública estatal y federal a favor del arbitraje. Las cláusulas contractuales de selección de foro están favorecidas y no hay nada que tienda a indicar que se haya violentado interés público alguno. Los tres errores imputados fueron cometidos.

## IV

Por lo ante expuesto, expedimos el auto de *certiorari* solicitado, revocamos la resolución en controversia y declaramos válida la cláusula de arbitraje en Arizona. En consonancia con nuestro dictamen, si la recurrida interesa continuar con su reclamación deberá hacerlo mediante arbitraje ante el foro seleccionado contractualmente.

El Juez Salas Soler concurre por considerar esencial a la controversia, que se hace indispensable concentrar en una sola jurisdicción o lugar, las reclamaciones que contra la peticionaria puedan generar más de 50,000 farmacias o cadenas de las mismas, que con ella hayan contratado y cuyas sedes ubican en multiplicidad de jurisdicciones.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2004 DTA 138

**1.** El TPI había emitido una Resolución el 19 de junio de 2003 en torno a un escrito presentado por la parte peticionaria intitulado *"Moción Solicitando desestimación o Paralización de los Procedimientos* mediante la cual se declaró nula la cláusula de arbitraje contenida en un contrato suscrito entre las partes de epígrafe, y no ha lugar la solicitud de desestimación. La peticionaria presentó una moción de reconsideración el 16 de julio de 2003, sobre la cual se expresó el TPI mediante la resolución aquí recurrida.

**2.** Véase Escrito de *Certiorari,* Índice del Apéndice, *Resolución,* a la pág. 9.

3. *Íd*, a la pág. 9.

4. Véase, Oposición a Expedición de Auto de *Certiorari*, Índice de Anejos, Núm. 10, a la pág. 47.

5. Véase Oposición a Expedición Auto de *Certiorari*, a la pág. 5.

6. Véase Escrito de *Certiorari*, Índice del Apéndice, *Moción Solicitando Desestimación o Paralización de los Procedimientos,* a la pág. 21.