Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| CARIBE PHYSICIANS PLAZA CORP.<br><br>Apelante<br><br>v.<br><br>DUI INCORPORADO<br><br>Apelados<br><br>------------------------------<br>CARIBE PHYSICIANS PLAZA CORP.<br><br>Apelados<br><br>v.<br><br>DUI INCORPORADO<br><br>Apelante | KLAN202400109<br>Consolidado con<br>KLAN202400111 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso Núm. NSCI201700280<br><br>Sobre: Incumplimiento de Contrato, Daños y Perjuicios<br>-------------------------<br>*Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso Núm. NSCI201700280<br><br>Sobre: Incumplimiento de Contrato, Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Rivera Marchand, el Juez Bonilla Ortiz y el Juez Pagán Ocasio.

Pagán Ocasio, juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de junio de 2024.

**I.**

El 8 de febrero de 2024, Caribe Physicians Plaza Corp. h/n/c Caribbean Medical Center (CMC) y DUI Incorporado h/n/c ImageFirst Healthcare Laundry Specialists (DUI), presentaron sendos recursos de apelación en los que solicitaron revocar una *Sentencia* emitida el 2 de enero de 2024 por el Tribunal de Primera Instancia, Sala Superior de Fajardo (TPI o foro primario).[2] En virtud del referido

---

[1] Mediante Orden Administrativa OATA2024-024, se designa a la Jueza Monsita Rivera Marchand, en sustitución de la Jueza Olga Birriel Cardona, quien dejó de ejercer funciones como Jueza del Tribunal de Apelaciones.
[2] Apéndice de la *Apelación presentada por CMC,* Anejo I, págs. 1-18. Archivada y notificada en autos el 9 de enero de 2024.

dictamen, el TPI resolvió que DUI incumplió el contrato suscrito entre las partes, por lo que CMC podía terminar anticipadamente el referido contrato por justa causa, sin que procediera penalidad alguna. No obstante, el foro primario no concedió una indemnización a favor de CMC, debido a que no logró establecer la cuantía de los daños sufridos como consecuencia del incumplimiento contractual.

El recurso radicado por CMC recibió el alfanumérico KLAN202400109; el presentado por DUI, recibió el KLAN202400111.

El 8 de febrero de 2024 DUI, en el caso KLAN202400111, radicó una Moción al amparo de la *Regla 19 del Reglamento del Tribunal de Apelaciones de Puerto Rico* en la que solicitó que se sometiera como evidencia la transcripción oral (TPO). Además, presentó una *Moción solicitando permiso para exceder el máximo de páginas, al amparo de la Regla 70 (D) del Tribunal de Apelaciones* al excederse del número mínimo de páginas establecido en nuestro reglamento.[3]

El 13 de febrero de 2024, en el caso KLAN202400109, emitimos una *Resolución* en la que le concedimos un término de cinco (5) días para que CMC acreditara el método de reproducción de prueba oral.

El 16 de febrero de 2024, emitimos una *Resolución* en la que ordenamos la consolidación de ambos casos al tratarse de una misma controversia. Además, calendarizamos el trámite apelativo a seguir y les concedimos a las partes varios términos y directrices sobre el manejo de la transcripción de prueba oral (TPO) del juicio en su fondo de forma que los casos fueran perfeccionados a tenor con el trámite apelativo correspondiente.

El 20 de febrero de 2024, CMC radicó una *Solicitud de término para someter la transcripción de la vista y alegato suplementario* en la

---

[3] Regla 70 (D) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 70 (D).

que solicitó que extendiéramos el término concedido para completar la TPO y el alegato suplementario.

El 22 de febrero de 2024 emitimos una *Resolución* en la que ordenamos a las partes a cumplir con lo dispuesto en nuestra *Resolución* del 16 de febrero de 2024 en términos del trámite procesal apelativo.

El 18 de marzo de 2024, CMC y DUI presentaron una *Moción conjunta en solicitud de prórroga* en la que solicitaron que extendiéramos el término para presentar la TPO.

En respuesta a la referida *Moción,* emitimos el 19 de marzo de 2024 una *Resolución* concediéndoles un término final hasta el 4 de abril de 2024 para que las partes cumpliesen con nuestro dictamen referente a la TPO.

CMC y DUI radicaron el 4 de abril de 2024 una *Moción conjunta sometiendo transcripción estipulada* notificándonos que cumplieron con lo ordenado.

El 5 de abril de 2024 emitimos una *Resolución* acogiendo la TPO estipulada. Además, concedimos un término para que DUI presentara su alegato suplementario y durante el referido término, CMC debía presentar su alegato en oposición a la *Apelación.* Por último, en caso de que DUI presentara un alegato suplementario, CMC podía presentar un alegato de réplica a los treinta (30) días siguientes.

El 3 de mayo de 2024, DUI radicó el *Alegato Suplementario* en el caso KLAN202400111, y a su vez el *Alegato en oposición* en el caso KLAN202400109. Solicitó que se deniegue la apelación de CMC y se conceda su solicitud de revocar al TPI y resolvamos que CMC canceló el contrato de forma indebida, lo que le amerita una compensación a DUI. En atención a estos escritos, emitimos una *Resolución* el 7 de mayo de 2024 concediéndole a CMC un término hasta el 7 de junio de 2024 para presentar alegato en oposición.

El 6 de mayo de 2024, CMC compareció y radicó su alegato en oposición al recurso de *Apelación* de DUI y radicó un alegato suplementario en relación a su recurso de apelación.

Con el beneficio de la comparecencia de las partes y el estudio de la TPO, procedemos a pormenorizar los hechos atinentes a los recursos de epígrafe.

**II.**

El caso de marras tuvo su génesis el 5 de junio de 2017, cuando CMC radicó una *Demanda* sobre incumplimiento de contrato y daños y perjuicios contra DUI.[4] En esta, CMC alegó los siguientes hechos:

1) La corporación DUI, cuyo presidente era el señor Carlos Bonilla Colón (señor Bonilla Colón), operaba una lavandería industrial en Guayama, Puerto Rico, que provee servicios de lavandería a hospitales.
2) CMC, presidido por la doctora Sara López Martín (doctora López Martín), poseía una facilidad de servicios de salud en Fajardo, que constaba de sala de emergencia, cuidados intensivos, sala de operaciones y hospitalizaciones hasta un máximo de cuarenta y cinco (45) camas.
3) Alrededor del 29 de marzo de 2011, CMC suscribió el Contrato Número MS00157 (Contrato) con DUI para que, en un periodo de setenta y dos (72) meses, la segunda corporación mencionada, le supliera semanalmente las sábanas, las cubiertas de almohadas, los topes de la ropa quirúrgica (*scrubs* quirúrgicos) y las batas para los pacientes.
4) El Contrato contenía una cláusula de renovación automática por un período de setenta y dos (72) meses, a menos que CMC notificara, por escrito, su determinación de no extenderlo con al menos noventa (90) días de anticipación a la fecha pautada de la terminación del Contrato.
5) En mayo de 2017, pasado el término de renovación de contrato, CMC cursó una comunicación en que no deseaban recibir los servicios de DUI por la pobre calidad de los productos.
6) El 8 de septiembre de 2015, CMC le informó al señor Bonilla Colón que las sábanas contenían roturas y residuos de cinta adhesiva. Además, CMC alegó que le solicitó a DUI una copia del procedimiento de limpieza, desinfección y de calidad, el cual no se le entregó.
7) La señora Karen Vega, supervisora de la sala de operaciones de CMC, le informó el 28 de febrero de 2017 a la señora Mayra Santiago de DUI sobre la

---

[4]Apéndice de la *Apelación presentada por CMC*, Anejo II, págs. 19-25.

insuficiencia de la cantidad de *scrubs* quirúrgicos y le solicitó un suplido adicional para el próximo día.

8) Según lo alegado en la reclamación, CMC no recibió el suplido adicional. CMC esgrimió que el incumplimiento por parte de DUI, le provocó pérdidas económicas, puesto que le obligó a pagar horas extras al personal y adquirir los *scrubs* quirúrgicos por otros medios para atender las cirugías que tenía pautadas.

9) CMC sostuvo que el 16 de marzo de 2017, se celebró una reunión en la que se le informó a los empleados de DUI sobre las tardanzas en la entrega de los *scrubs* quirúrgicos y la distribución de las sábanas, la cual no satisfacía las necesidades convenidas. Manifestó que, pese a dicha reunión, las deficiencias señaladas persistieron.

10) El 19 de mayo de 2017, CMC le envió una carta a DUI en la que le informó sobre la intención de descontinuar sus servicios.

11) CMC alega que el 22 de mayo de 2017 DUI le replicó que consultara con su abogado la intención de terminar el Contrato.

12) El 23 de mayo de 2017, DUI removió el inventario de suplidos de sus facilidades.

13) El 24 de mayo de 2017, CMC le informó a DUI su desistimiento de terminar el contrato, por lo que tenía hasta el 26 de mayo de 2017 para reiniciar el servicio y subsanar las deficiencias.

14) El señor Bonilla Colón asistió a una reunión el día 1 de junio de 2017, la cual contaba con la presencia de la doctora López Martín, Ana Oliveras Laguna (licenciada Oliveras Laguna) y Patricia De Frías Tejada (licenciada De Frías Tejada), en la que se reafirmó el interés de CMC en dejar sin efecto la intención de terminar el Contrato.

15) El señor Bonilla Colón reiteró que DUI no reiniciaría el servicio objeto del Contrato y que solicitaría el pago por su terminación.

16) CMC alegó que, ante el incumplimiento de DUI de no reiniciar el servicio contratado, tuvo que realizar inversiones sustanciales para brindarle el servicio médico a sus pacientes. Consecuentemente, DUI le causó unos daños estimados en $360,000.00.

Por todo lo anterior, solicitó que el foro primario declarara que DUI menoscabó la relación de negocios con CMC; ordenara la rescisión del Contrato; condenara a DUI al pago de los daños causados a CMC, entre otros remedios que en derecho proceda.

El 28 de agosto de 2017, DUI presentó una *Contestación a demanda y reconvención*, en la que alegó que siempre actuó conforme al Contrato, pero CMC se negó a modificar o aumentar el servicio, aunque su alto volumen lo requería.[5] Según planteó, CMC utilizó los

---

[5] *Íd.*, Anejo III, págs. 26-35.

servicios de otra compañía y solicitó la terminación del Contrato, la cual DUI aceptó, y por ello, retiró su inventario. A su vez, DUI reconvino a los fines de reclamar una suma ascendente a $274,405.91, y que, en la eventualidad de una reclamación de cobro de dinero, las partes acordaron un pago de honorarios de abogados aproximados al quince por ciento (15%) de la cuantía reclamada, un equivalente a $41,160.88, más las costas. Reclamó que, como las partes se obligaron contractualmente a estas sumas, las mismas eran líquidas y exigibles.

El 29 de diciembre de 2017, CMC presentó una *Contestación a reconvención*, enfatizando que el 24 de mayo de 2017 había desistido su intención de terminar el Contrato y optó por solicitar el cumplimiento contractual.[6]

Tras varios trámites procesales, el 5 de marzo de 2020, el TPI emitió una *Sentencia parcial* en la que, en síntesis, declaró No Ha Lugar las causas de acción de incumplimiento de contrato y daños presentada por CMC y Ha Lugar la reconvención solicitada por DUI.[7]

Inconforme con tal determinación, CMC acudió ante esta Curia mediante un recurso de apelación la cual recibió el alfanumérico KLAN202000464. Tras varios trámites procesales, el 5 de octubre de 2020, un panel hermano emitió una sentencia en la que revocó la *Sentencia parcial*, resolviendo que existía una controversia real sobre los hechos esenciales que impedían disponer el caso sumariamente, por lo que se requería la celebración de una vista, y devolvió el caso al TPI.[8]

Devuelto al foro de origen, se celebró el juicio en su fondo en las fechas de 27, 28 y 29 de marzo de 2023. La prueba testifical de CMC consistió en los testimonios de las señoras Gloria Delgado

---

[6] *Íd.*, Anejo IV, págs. 36-39.
[7] Apéndice de *Apelación presentada por DUI*, Anejo XII, págs. 229-239. Archivada y notificada en autos el 9 de marzo de 2020.
[8] *Íd.*, Anejo XIII, págs. 240-248. Panel compuesto por los jueces Sánchez Ramos, Candelaria Rosa y Pagán Ocasio.

Pabón (señora Delgado Pabón), Sandra Reyes Delgado (señora Reyes Delgado), Zuleika Ponce Sepúlveda (señora Ponce Sepúlveda), las licenciadas Patricia De Frías Tejada y Ana Oliveras Laguna, la doctora Sara López Martín y del señor Eduardo Sotomayor Sánchez (señor Sotomayor Sánchez). A su vez, CMC presentó como perito al contable Iván Canabal Pérez (CPA Canabal Pérez). Por su parte, DUI presentó como prueba testifical a la señora Mariví Alvarado Perdomo (señora Alvarado Perdomo), el señor Carlos Bonilla Colón y el señor Reynaldo Rivera Rodríguez (señor Rivera Rodríguez).

A continuación, pormenorizamos las porciones de la TPO atinentes a los errores señalados por ambas partes en los recursos consolidados de epígrafe, los cuales consignaremos posteriormente.

**Señora Gloria Delgado Pabón**

La señora Delgado Pabón alegó que fungió como supervisora de la sala de operaciones y directora de enfermería de CMC.[9] Entre sus funciones como supervisora en la sala de operaciones, le correspondía validar la disponibilidad del equipo para operar, la vestimenta del personal y las sábanas.[10] Con relación al servicio de entrega de *scrubs* quirúrgicos por parte de DUI, expresó que "habían ocasiones en que a veces teníamos el '*scrub'* quirúrgico y a veces no teníamos el '*scrub'* quirúrgico".[11] Declaró que la falta de *scrubs* quirúrgicos, causaban que no se pudieran realizar las cirugías en CMC y por consiguiente los casos se atrasaban.[12]

**Señora Sandra Reyes Delgado**

La señora Reyes Delgado declaró labora en CMC desde el 2011 y, actualmente se desempeña como compradora y su función es mantener control del inventario de la institución hospitalaria y verificar las situaciones relacionadas con los suplidos.[13] Expresó que

---

[9] TPO del 27 de marzo de 2023, pág. 38, líneas 15-23.
[10] *Íd.*, pág. 39, líneas 6-14.
[11] *Íd.*, pág. 42, líneas 14-19.
[12] *Íd.*, pág. 43, líneas 5-7, 15-17.
[13] *Íd.*, pág. 55, líneas 18-24; pág. 56, líneas 2-13; pág. 60, líneas 24-25.

del 2012 al 2017, CMC se enfrentó a quejas constantes de los distintos departamentos de la institución hospitalaria relacionadas al incumplimiento de DUI con la cantidad de suplido.[14] Especificó que, ante una necesidad de vestir cuarenta y cuatro (44) camas, el suplido de DUI únicamente permitía vestir quince (15) camas.[15] Ante esto, testificó que llamaba a la señora Mayra Santiago de DUI para plantearle la situación y esta solicitaba oportunidad para verificar la disponibilidad de una ruta, dado que la compañía estaba corta de suplidos.[16] La señora Reyes Delgado empero, según manifestó en ocasiones el suplido especial no llegaba.[17]

**Señora Zuleika Ponce Sepúlveda**

La señora Ponce Sepúlveda expresó que funge como Supervisora de Finanzas de CMC y está a cargo de la aprobación de la nómina de la institución hospitalaria.[18] Alegó que, en el periodo de enero a julio de 2017, CMC pagó alrededor de $12,000.00 adicionales por concepto de horas extras al personal de la sala de operaciones, comparado con igual periodo en el año 2018.[19]

**Señor Eduardo Sotomayor Sánchez**

El señor Sotomayor Sánchez indicó que del 2010 al 2015, se desempeñó como Administrador de Servicios de Salud en CMC.[20] Entre sus funciones, firmaba los contratos de CMC y supervisaba la rendición de los servicios de los contratistas por medio de los informes que redactaban los supervisores de la institución hospitalaria.[21] Según relató, los supervisores de CMC le informaban sobre las entregas tardía de DUI.[22]

**Licenciada Patricia De Frías Tejada**

---

[14] *Íd.*, pág. 61, líneas 3-9; pág. 71, líneas 23-25, pág. 72, líneas 5-11.
[15] *Íd.*, pág. 61, líneas 3-7.
[16] *Íd.*, pág. 64, líneas 6-24.
[17] *Íd.*, pág. 67, líneas 18-22.
[18] *Íd.*, pág. 106, líneas 10-23.
[19] *Íd.*, pág. 122, líneas 6-11, pág. 130, líneas 6-14; pág. 131, líneas 16-20; pág. 133, líneas 12-25.
[20] *Íd.*, pág. 153, líneas 15-24; pág. 154, líneas 1-5.
[21] *Íd.*, pág. 154, líneas 10-14.
[22] *Íd.*, pág. 158, línea 25; pág. 159, línea 1; pág. 164, líneas 13-14.

La licenciada De Frías Tejada testificó que del 2015 al 2019 fungió como Directora de Programas Institucionales de CMC y manejaba los aspectos regulatorios y de calidad de la institución hospitalaria.[23] Relató que cuando visitaba la sala de operaciones a las seis de la mañana, en ocasiones se enfrentaba con la situación de la falta de suplido al carecer de suficientes *scrubs* quirúrgicos para comenzar las cirugías del día y no contaban con las suficientes sábanas para bañar a los pacientes.[24] También, indicó que las sábanas y los *scrubs* quirúrgicos estaban rotos y manchados, lo cual les obligaba a descartar dichos materiales y quedarse sin el suplido necesario para operar en el día.[25] Testificó que cuando se comunicaba con DUI, en ocasiones entregaban los suplidos, otras no.[26] Relató que sostuvo una reunión con la señora Mariví Alvarado Perdomo para dialogar sobre la preocupación operacional de la institución hospitalaria por la importancia de tener el suplido necesario.[27] Detalló que luego de varios días en los que DUI entregó más suplido, volvían a estar faltos de estos, por lo que nuevamente tenían que comunicarse con el suplidor.[28] Expresó que, posterior a emitir una carta de cese de los servicios de DUI, sostuvo una reunión con el señor Bonilla Colón para que cumpliera con la expectativa de ofrecer un buen servicio, pero el señor Bonilla Colón se negó a brindarlo.[29] Estableció que, posterior a dicha reunión, DUI nunca reestableció el servicio de suplido.[30]

**Licenciada Ana Oliveras Laguna**

La licenciada Oliveras Laguna atestiguó que labora como Administradora en CMC desde el 2016. [31] Señaló que, al no estar

---

[23] *Íd.*, pág. 198, líneas 12-17.
[24] *Íd.*, pág. 198, líneas 20-25; pág. 199, líneas 2-12; pág. 201, líneas 1-20.
[25] *Íd.*, pág. 202, líneas 7-13.
[26] *Íd.*, pág. 202, líneas 23-25; pág. 203, líneas 1-2.
[27] *Íd.*, pág. 203, líneas 17-25; pág. 204, líneas 1-3.
[28] *Íd.*, pág. 203, líneas 17-25; pág. 204, líneas 1-3.
[29] *Íd.*, pág. 205, líneas 3-17.
[30] *Íd.*, pág. 206, líneas 19-22.
[31] *Íd.*, pág. 228, líneas 11-16; líneas 22-25.

disponible los *scrubs* quirúrgicos ni las sábanas, la sala de operaciones no podía funcionar, teniendo como secuela las cancelaciones o los atrasos de las cirugías, molestia de los pacientes, e indisponibilidad de los cirujanos.[32] Estableció que la entrega de los suplidos debía realizarse antes de las siete de la mañana, puesto que a esa hora comenzaban las cirugías. No obstante, DUI entregaba el suplido de lunes a sábado, entre las nueve a las once de la mañana, un horario que provocaba que el personal trabajara horas extras por el retraso de las cirugías.[33] Además, sostuvo que dicho horario de entrega les afectaba porque los pacientes se tenían que bañar inmediatamente después del desayuno y conllevaba un retraso en los tratamientos de cuidados de la piel.[34] Arguyó que, ante los problemas enfrentados con DUI, CMC tuvo que peticionar los suplidos con *Cadillac Uniforms*.[35] Sin embargo, admitió que en el Contrato no se pautó un horario de entrega de los suplidos.[36]

**Doctora Sarah López Martín**

La doctora López Martín testificó que ha trabajado como Directora Ejecutiva de CMC desde el 2001.[37] Relató que, al verificar las bitácoras de entregas, encontró que DUI realizaba entregas parciales. Expresó que DUI incumplió su obligación de entregar órdenes tres (3) días a la semana porque, en la práctica, entregaban suplidos todos los días ya que las órdenes estaban incompletas.[38] Además, estableció que el camión de DUI llegaba a las once de la mañana, a las doce del mediodía o a la una de la tarde.[39] Esgrimió que, pese a que los pacientes llevaban veinticuatro (24) horas en

---

[32] *Íd.*, pág. 234, líneas 16-20; pág. 235, líneas 8-15.
[33] *Íd.*, pág. 235, líneas 8-15; pág. 236, líneas 8-14; pág. 237, líneas 1-2; TPO del 28 de marzo de 2023, pág. 282, líneas 14-25; pág. 283, líneas 1-11.
[34] TPO del 27 de marzo de 2023, pág. 237, líneas 7-25.
[35] TPO del 28 de marzo de 2023, pág. 307, líneas 20-25; pág. 308, líneas 1-18; pág. 317, líneas 5-15.
[36] *Íd.*, pág. 263, líneas 7-13.
[37] *Íd.*, pág. 331, líneas 8-12.
[38] *Íd.*, pág. 340, líneas 17-25; pág. 341, líneas 1-8; pág. 342, líneas 22-25; pág. 343, líneas 1-13.
[39] *Íd.*, pág. 345, líneas 22-25, pág. 346, línea 1.

ayuno para someterse a una cirugía pautada para las seis de la mañana, no era hasta la una de la tarde que CMC recibía la ropa para operarlos.[40] Otro problema era que los cirujanos que operaban en CMC tenían un horario específico en la mañana porque en la tarde realizaban cirugías en otras instituciones hospitalarias, por lo que se tenían que cancelar las cirugías.[41] A saber, relató lo siguiente:

> [CMC] tenía dos cirujanos, pero esos cirujanos trabajan, operan en nuestro hospital, pero operan en otros hospitales, uno de ellos [...] venía a nuestro hospital a operar en unas horas determinadas, tenía unos pacientes citados para unas horas determinadas, por la mañana operaba con nosotros bien temprano [...] por la tarde se iba a otro hospital. Daban las doce de la mañana y ya no podía operar, pues cancelaba el caso. Usted tenía un paciente acostado en una camilla desde la noche anterior, acostado en su casa, que vino por la mañana para operar, en ayunas, y no se podía operar, ese era el caso de los que venían de afuera, que eran cirugías ambulatorias, pero el caso de los pacientes hospitalizados que amanece[n] en ayuna para ser operados por la mañana, el caso tenía otras connotaciones financieras, y es que las compañías de seguros, si hay un caso posteado para operarse a tal día, a tal hora, posteado para mañana para cirugía, si el hospital no lo opera, la compañía de seguros, y si la razón es no porque al paciente le subió la azúcar o le bajó, o se sintió mal, o por su condición el anestesiólogo no lo entró a sala, sino por razones externas de administración del hospital, la compañía de seguros deniega el pago de ese día. O sea, que el hospital tenía pérdidas financieras porque ese día es denegado automático [...].[42]

**Señora Mariví Alvarado Perdomo**

La señora Alvarado Perdomo declaró que desde el 2003 labora para CMC en el área de contabilidad de DUI, como gerente de planta y gerente de operaciones y servicio.[43] Testificó que DUI brindaba cinco (5) días de servicio a CMC.[44] Estableció que a los cinco (5) días de la notificación de la terminación del Contrato, DUI recogió el inventario de CMC, otorgándole tiempo para que la institución hospitalaria realizara la logística necesaria para continuar con los

---

[40] *Íd.*, pág. 347, líneas 4-13; pág. 348, líneas 11-25; pág. 349, líneas 1-12.
[41] *Íd.*, pág. 348, líneas 9-21.
[42] *Íd.*, pág. 348, líneas 11-23; pág. 349, líneas 1-12.
[43] TPO del 29 de marzo de 2023, pág. 379, líneas 17-24; pág. 380, líneas 1-24.
[44] TPO del 28 de marzo de 2023, pág. 244, líneas 15-21.

servicios.[45] A su vez, apuntó que DUI tenía una tabla de penalidad en la que se pagaba un cuarenta por ciento (40%) de las semanas faltantes del acuerdo de servicio y que en su virtud, CMC tenía un total adeudado de $274,405.91, además del cargo de quince por ciento (15%) de la cantidad reclamada y los costos de litigio, ascendentes a aproximadamente $42,000.00.[46]

**Señor Carlos Bonilla Colón**

El señor Bonilla Colón declaró que es empresario y desde el 2000, presidente y director ejecutivo de DUI.[47] Testificó que el Contrato se renovó mediante la cláusula de renovación al no ser cancelado dentro de los noventa (90) días antes de la fecha de terminación.[48]

**Señor Reynaldo Rivera Rodríguez**

El señor Rivera Rodríguez testificó que lleva nueve (9) años laborando en DUI.[49] Del 2016 al 2017 realizó gestiones de cobro, renovaciones de contrato y entrega de suplidos de emergencias por las tardes, declaró.[50] Estableció que CMC requería mucho inventario, por lo que cuando sus empleados llamaban a DUI para peticionar un suplido adicional al entregado por la mañana, él realizaba la entrega por la tarde.[51] Asimismo, expresó que cuando se enteró que CMC descontinuó el servicio de DUI, se preparó una carta de penalidad, la cual entregó a la licenciada Oliveras Laguna, quien le autorizó a recoger el suplido usado.[52]

**CPA Iván Canabal Pérez**

El CPA Canabal Pérez preparó un informe sobre las facturas que DUI le emitió a CMC durante el período de mayo de 2012 a

---

[45] TPO del 29 de marzo de 2023, pág. 370, líneas 3-8.
[46] *Íd.*, pág. 374, líneas 3-13; pág. 375, líneas 20-25; pág. 376, líneas 1-4.
[47] *Íd.*, pág. 422, líneas 11-23; pág. 423, líneas 9-12.
[48] *Íd.*, pág. 425, líneas 2-6.
[49] *Íd.*, pág. 456, líneas 4-9.
[50] *Íd.*, pág. 457, líneas 1-10.
[51] *Íd.*, pág. 458, líneas 8-16.
[52] *Íd.*, pág. 459, líneas 10-25; pág. 460, líneas 15-20.

agosto de 2012, en el que encontró que se trataba de facturas de precios unitarios.[53]

El TPI admitió como evidencia el informe pericial preparado por el CPA Canabal Pérez. Posterior a la celebración de la conferencia con antelación al juicio, el CPA Canabal Pérez preparó un informe pericial enmendado para cambiar el valor monetario de las cancelaciones de las cirugías en CMC.[54] El TPI determinó que dicho informe pericial enmendado es una prueba ofrecida y no admitida.

El foro recurrido admitió como prueba documental siete (7) exhibits estipulados por las partes y dos (2) exhibits de la parte demandante. Concluido el desfile de prueba, tras evaluar la evidencia documental, testifical y pericial desfilada, el 2 de enero de 2024, el TPI emitió una *Sentencia* en la que declaró Con Lugar la *Demanda* promovida por CMC y No Ha Lugar la reconvención presentada por DUI.[55] El TPI concluyó que DUI incumplió el Contrato y pretendió abusar de sus prerrogativas contractuales. Por ello, resolvió que CMC podía terminar el Contrato por justa causa, razón por la cual no procedía una penalidad por terminación anticipada. No obstante, no le concedió a CMC la partida de indemnización por daños, toda vez que no logró establecer la cuantía de los daños sufridos a consecuencia del incumplimiento contractual de DUI.

En la *Sentencia*, el TPI determinó no otorgarle credibilidad al testimonio de la señora Alvarado Perdomo, consignando lo siguiente:

> **El testimonio de Alvarado, Gerente de Operaciones y Servicio de DUI, tanto por el tono y contenido de sus contestaciones como por su lenguaje corporal, no nos mereció credibilidad.** Durante el directo, el testimonio de Alvarado nos pareció ensayado y ceñido a un libreto. Durante el contrainterrogatorio, cuando las preguntas del abogado de la parte Demandante pretendían sacarla del librero, a menudo no lograba ser

---

[53] TPO del 28 de marzo de 2023, pág. 200, líneas 17-23; pág. 204, líneas 9-25.

[54] *Íd.*, pág. 189, líneas 21-25; pág. 190, líneas 1-25, pág. 191, líneas 1-25; pág. 193, líneas 21-25; pág. 194, líneas 1-19, pág. 195, líneas 3-4.

[55] Apéndice de la *Apelación presentada por CMC*, Anejo I, págs. 1-18. Archivada y notificada en autos el 9 de enero de 2024.

responsiva, no entendía preguntas sencillas, y su expresión nos pareció forzada. Su testimonio también resultó, en parte, contrario a la prueba documental y los hechos adjudicados en [la] *Sentencia Parcial*. Por ejemplo, testificó que DUI recogió sus materiales 5 días después de la notificación de cancelación de Contrato para darle tiempo a CMC para atender los asuntos logísticos de la terminación del contrato, hacer los arreglos pertinentes y no afectar las operaciones del Hospital. Sin embargo, surge de la *Sentencia Parcial* del 5 de marzo de 2020 y de la Sentencia del Tribunal de Apelaciones que DUI recogió los materiales el 23 de mayo de 2017. [...] O sea, cuatro días después de la Carta del 19 de mayo de 2019 y al día siguiente de la carta donde DUI informa a CMC que procesaría la cancelación al cabo de 5 días laborables. (Énfasis nuestro).[56]

Inconforme con el dictamen emitido por el TPI, el 8 de febrero de 2024, CMC compareció ante este Tribunal, en el caso KLAN202400109, y esbozó que el foro primario cometió los siguientes errores:

**PRIMER ERROR**: ERRÓ EL TPI AL DETERMINAR – CONTRARIO A LA PRUEBA DESFILADA Y A SUS PROPIAS DETERMINACIONES DE HECHO – QUE LA PARTE APELANTE NO PROBÓ LA CUANTÍA DE LOS DAÑOS SUFRIDOS A CONSECUENCIA DEL INCUMPLIMIENTO CONTRACTUAL DE DUI INCORPORADO, CONFIGURÁNDOSE ASÍ UN ERROR MANIFIESTO QUE JUSTIFICA LA INTERVENCIÓN DE ESTE HONORABLE TRIBUNAL.

**SEGUNDO ERROR:** ERRÓ EL TPI AL NO ADMITIR EN EVIDENCIA EL INFORME PERICIAL ENMENDADO DEL CPA IVÁN CANABAL, CONFIGURÁNDOSE UN CLARO ABUSO DE DISCRECIÓN.

En esencia, CMC argumentó que el foro primario erró al resolver que no lograron probar la cuantía de los daños sufridos, los cuales estaban en el informe pericial del CPA Canabal Pérez. Arguyó que, de enero a junio de 2017, CMC tuvo una pérdida de $12,000.00 por concepto de pago de horas extras al personal, debido al incumplimiento de DUI con sus obligaciones contractuales, lo que tuvo un impacto negativo en sus operaciones. A su vez, alega que el foro primario erró en no admitir el informe pericial enmendado del

---

[56] *Íd.*, pág. 2.

CPA Canabal Pérez. Por ello, solicitó que revoquemos parcialmente la *Sentencia* dictada el 2 de enero de 2024 por el TPI.

Por otro lado, insatisfecho con la determinación del foro primario, el mismo 8 de febrero de 2024, DUI compareció ante este foro, en el caso KLAN202400111, y estableció que el TPI incidió en los siguientes errores:

**PRIMER ERROR:** ERRÓ EL TPI AL EMITIR UNA SENTENCIA CON TOTAL AUSENCIA DE LOS HECHOS RELACIONADOS A LA POSICIÓN DE DUI, INC., O SEA, EN TÉRMINOS PRÁCTICOS LOS TESTIMONIOS DE DUI, INC., CASI NO APARECEN EN LA SENTENCIA Y CUANDO APARECEN SE HACEN INFERENCIAS Y SE EMITEN OPINIONES LAS CUALES SE TOMAN COMO UN HECHO. EJEMPLO DE ESTO ES, LA OPINIÓN QUE EMITE LA HONORABLE JUEZ EN EL INCISO #24 DE LA SECCIÓN DE DETERMINACIONES DE HECHO DE LA SENTENCIA. DONDE INFIERE QUE EL SR. BONILLA NO ESTABA ENTERADO DE UNA SERIE DE EVENTOS Y SOBRE ESTO NO EXISTE PRUEBA, SINO QUE SE TRATA DE UNA INFERENCIA. POR OTRO LADO, SE DESCARTÓ EL TESTIMONIO AMPLIO DE LA TESTIGO MARYEBEE ALVARADO, GERENTE DE DUI, INC., ALEGANDO QUE ERA UN LIBRETO ENSAYADO, Y QUE LA TESTIGO NO ENTENDIÓ PREGUNTAS SENCILLAS, ENTRE OTRAS, PERO EL HONORABLE TRIBUNAL, NO PUDO PROVEER NI UN SOLO EJEMPLO CONCRETO DE ESTAS SUPUESTAS CARACTERÍSTICAS DEL TESTIMONIO DE LA TESTIGO. EL ÚNICO EJEMPLO QUE BRIND[Ó] FUE RELACIONADO [A] UN APARENTE ERROR O EQUIVOCACIÓN EN UN LAPSO DE (1) DÍA SOBRE UNA FECHA OCURRIDA HAC[Í]A MÁS DE (5) AÑOS ANTES DEL JUICIO. ESTOS HECHOS O SUCESOS PROCESALES Y DE APRECIACIÓN POR SÍ MISMOS, CONVIERTEN EN INSUFICIENTE DICHA SENTENCIA. EMPERO, LO MÁS RELEVANTE ES QUE DE UNA LECTURA DE ESTA SENTENCIA SE PUEDE RAZONABLEMENTE CONCLUIR A GRANDES RASGOS QUE EXISTIÓ UNA POTENCIAL PARCIALIDAD Y LA COMISIÓN DE ERRORES MANIFIESTOS EN LA APRECIACIÓN DE LA PRUEBA Y EL RECHAZO ABSOLUTO DE LA PRUEBA TESTIFICAL DE DUI INC., Y UN EXCESO DE CREDIBILIDAD AL TESTIMONIO Y LAS TEORÍAS FORZADAS DE LA PARTE DEMANDANTE. RECORDEMOS QUE LA INMENSA MAYORÍA DE ESTOS HECHOS NO ESTABAN BASADOS EN PRUEBA DOCUMENTAL, SINO EN SUPUESTAS INFERENCIAS DE LA PARTE DEMANDANTE. COMO POR EJEMPLO, Y SEGÚN LA SENTENCIA, QUE LA PARTE DEMANDANTE INFIRIÓ "RAZONABLEMENTE" QUE LOS (5) DÍAS QUE SE MENCIONAN EN LA CARTA DE DUI, INC., RECLAMANDO EL PAGO DE LA PENALIDAD POR CANCELACIÓN DE CONTRATO, ERA UN TÉRMINO PARA QUE LA DEMANDANTE "LO PENSARA" Y NO

CANCELARA EL CONTRATO, A PESAR DE QUE FUE ESTA QUIEN LO CANCELÓ, PROCEDIÓ A RETIRAR SU CANCELACIÓN PARA EVADIR SU RESPONSABILIDAD CONTRACTUAL, AUTORIZÓ EL RECOGIDO DE LOS MATERIALES Y CONTRATÓ UNA NUEVA COMPAÑÍA PARA EL SERVICIO, LA CUAL COMENZÓ SUS LABORES EL MISMO DÍA DEL RECOGIDO DE DUI, INC., EL 23 DE MAYO DE 2017. FINALMENTE, SE EXHIBE OTRO PATENTE ERROR MANIFIESTO EN LA APRECIACIÓN DE LA PRUEBA, PUES EL HONORABLE TRIBUNAL INFIRIÓ QUE EL TÉRMINO DE (5) DÍAS MENCIONADO EN LA CARTA DUI, INC., INFORMABA A LA DEMANDANTE-APELADA QUE SE PROCEDERÍA A RECOGER EL INVENTARIO EN DICHO TERMINO, A PESAR DE QUE VIRTUALMENTE NO EXISTE PRUEBA DE ELLO. SINO QUE SE TRATÓ DE OTRA INFERENCIA INSOSTENIBLE DEL HONORABLE TRIBUNAL.

**SEGUNDO ERROR:** ERRÓ EL TPI AL EMITIR SENTENCIA RESOLVIENDO QUE DUI, INC., CONCEDIÓ A LA PARTE DE DEMANDADA UN PLAZO DE (5) DÍAS PARA QUE LA DEMANDANTE-APELADA CONSIDERARA RETIRAR LA CANCELACIÓN DE CONTRATO SOLICITADA Y NOTIFICADA POR ESCRITO A DUI, INC. LA PRUEBA DOCUMENTAL ESTABLECE CLARAMENTE LO CONTRARIO. ES DECIR, LA PARTE DEMANDANTE SOLICIT[Ó] LA CANCELACIÓN DEL CONTRATO POR ESCRITO Y AGRADECIENDO LOS SERVICIOS DE DUI, INC., EL DÍA 19 DE MAYO DE 2017, Y EL DÍA 22 DE MAYO DE 2017 DEMANDADA DUI INC., LE ENVIÓ UNA FACTURA POR CANCELACIÓN ANTICIPADA DE ACUERDO CON EL CONTRATO ENTRE LAS PARTES, COPIA DEL CONTRATO Y UNA MISIVA QUE CLARAMENTE ESTABLECE QUE DE NO RECIBIR EL PAGO DE SU PARTE EN UN PLAZO DE (5) DÍAS SE REFERIRÁ EL ASUNTO A LA DIVISIÓN LEGAL PARA EL TRÁMITE DE COBRO. POR ÚLTIMO, TAMBIÉN SE LES INFORMÓ QUE CUALQUIER DUDA SE MANEJARÍA A TRAVÉS DEL ENCARGADO DE ESTA CUENTA, EL SR. REINALDO RIVERA.

En síntesis, DUI planteó que el TPI demostró parcialidad y error manifiesto en la apreciación de la prueba porque, en las determinaciones de hechos, el tribunal dispuso pocos elementos a favor de la posición de DUI, existiendo una inclinación hacia los testimonios de CMC. Por todo ello, DUI nos solicitó que revoquemos la *Sentencia* emitida por el TPI y consecuentemente, ordenemos el pago de la penalidad por la terminación anticipada del Contrato.

A tenor con los señalamientos de error presentados en los casos consolidados de epígrafe, pormenorizaremos la normativa jurídica aplicable a la controversia ante nos.

**III.**

**A.**

El artículo 1206 del Código Civil de 1930, 31 LPRA ante. sec. 3371, establece que un contrato existe desde que una o varias personas consienten en obligarse respecto a otra u otras a dar alguna cosa o prestar algún servicio.[57] El referido artículo está cimentado en que, las obligaciones nacen de los contratos, la ley, los cuasicontratos y los actos y omisiones en que intervenga la culpa o negligencia. ***Demeter Int'l v. Srio Hacienda***, 199 DPR 706 (2018). Una vez concurren los elementos necesarios para el perfeccionamiento del contrato, las partes quedan obligadas a cumplir con los términos y condiciones al tener fuerza de ley. ***Demeter Int'l v. Srio Hacienda***, *supra,* pág. 727. Las partes no solo consienten a lo expresamente pactado sino también a todas las circunstancias que surjan de este y sean conformes a la ley, buena fe y uso. ***Demeter Int'l v. Srio Hacienda***, *supra*, pág. 727.

Por otro lado, existe una categoría de contrato que se denomina, contrato de adhesión. El contenido de este tipo de contrato solo lo redacta una de las partes de forma que el otro contrayente no contribuye en la formación del contenido contractual. ***Coop Sabanera*** v. ***Casiano Rivera***, 184 DPR 169 (2011). Se sustituye la determinación bilateral por un acto de aceptación de un esquema unilateral. ***Coop Sabanera*** v. ***Casiano Rivera***, *supra* pág. 176. Los contratos de adhesión se interpretarán de manera desfavorable para el que las redacta y favorable para la parte que nada tuvo que ver en su redacción. ***Coop Sabanera*** v. ***Casiano Rivera***, *supra*, pág. 177.

En otros términos, en nuestro ordenamiento jurídico se le considera cláusula penal a aquella estipulación de carácter accesorio

---

[57] Puesto que los hechos de este caso se suscitaron durante la vigencia del Código Civil de 1930, derogado por virtud del Código Civil de 2020, Ley Núm. 55-2020, según enmendada, 33 LPRA sec. 5311 *et seq.,* es aplicable el antiguo estatuto.

que se establece en el contrato. ***Levitt and Sons Inc.,*** v. ***Daco***, 105 DPR 164 (1976). La finalidad de la cláusula penal es asegurarse del cumplimiento de la obligación principal en caso de que el deudor de la prestación no cumpla este viene obligado a pagar determinada cantidad de dinero. ***Levitt and Sons Inc.,*** v. ***Daco***, *supra*, pág. 193. Su propósito es asegurar el cumplimiento de una obligación y evaluar anticipadamente los perjuicios que se ocasionarían al acreedor en caso del incumplimiento de la obligación. ***Class*** v. ***Vehicle Eqmnt. Leasing Co***, 143 DPR 186 (1997). La cláusula penal tiene como finalidad tener una evaluación anticipada de los perjuicios que habría de ocasionarse al acreedor por el incumplimiento de la obligación principal. ***Class*** v. ***Vehicle Eqmnt. Leasing Co***, *supra*, pág. 204.

**B**.

La Regla 42.2 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 42.2, establece que las determinaciones de hecho sujetas a un testimonio oral no se dejarán sin efecto a menos que sean erróneas y se dará la debida consideración que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. En esa línea, el Tribunal Supremo ha resuelto que no intervendremos ni alteraremos innecesariamente las determinaciones de hecho que haya formulado el Tribunal de Primera Instancia, luego de presenciar, evaluar y admitir la prueba presentada en el juicio. **Suárez Cáceres v. Com. Estatal de Elecciones**, 176 DPR 31 (2009). Consecuentemente, no podemos intervenir en las determinaciones de hecho, apreciación de la prueba y adjudicaciones de credibilidad de los testigos en "ausencia de error, perjuicio, pasión y parcialidad". ***Argüello*** v. ***Argüello***, 155 DPR 62, 79 (2001). Es por eso que se les brinda deferencia a las determinaciones de hecho realizadas por el juez de instancia. ***González Rivera*** v. ***Torres Laracuente***, 203 DPR 645 (2019). La frase "en ausencia de error, perjuicio, pasión y parcialidad" hace referencia a cuando el juzgador no actúa motivado por

inclinaciones personales de tal modo que adopta posiciones, rechazos o preferencias con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba que se reciba o se tome en sala. *Dávila Nieves* v. *Meléndez Marín*, 187 DPR 750 (2013). Este principio está cimentado en que las determinaciones de hecho al estar fundamentadas en elementos subjetivos, el juez de instancia es quien está en mejor posición de aquilatar la prueba. Del mismo modo, no podemos descartar y sustituir bajo nuestras propias apreciaciones basadas en el expediente, las determinaciones del foro primario. *Rolón* v. *Charlie Car Rental, Inc*, 148 DPR 420 (1999). El juez de instancia es "el que tiene la oportunidad de poder ver a los testigos, observar su manera de declarar, apreciar sus contradicciones, dudas, vacilaciones e ir creando gradualmente en su consciencia la convicción en cuanto a si hay o no derecho al remedio solicitado". *Figueroa* v. *American Railroad Co. Of PR*, 64 DPR 335 (1944). En vista de ello, el foro primario es a quien la ley le concede la facultad de examinar la prueba y determinar la credibilidad de los testigos, por ende, nosotros no estamos en posición de alterar las conclusiones de un juez de instancia. *Figueroa* v. *American Railroad Co. Of PR*, supra pág 339. La determinación de credibilidad del foro primario merece gran deferencia de nuestra parte pues este foro es quien estuvo en mejor posición de aquilatar la prueba testifical desfilada. *Argüello* v. *Argüello*, *supra* pág. 79.

En otros términos, tal doctrina no tiene inmunidad absoluta ante nuestra función. *González Rivera* v. *Torres Laracuente*, *supra* pág. 666. Se incurre en un error manifiesto cuando "la apreciación de esa prueba se distancia de una realidad fáctica o inherentemente imposible o increíble". Consecuentemente, se consideran erróneas las conclusiones del TPI si "las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia." A tenor con lo anterior, no debemos intervenir con la

valorización de los daños que estime el TPI a menos que sea una cuantía exageradamente baja o alta. *Santiago Montañez* v. *Fresinius Medical*, 195 DPR 476 (2016). La glosa jurisprudencial reiteradamente ha enfatizado que el foro primario está en mejor posición para estimar la valorización de los daños al tener contacto directo con la prueba. *Santiago Montañez* v. *Fresinius Medical*, *supra* págs. 490-91.

## IV.

En el presente caso, DUI planteó que el foro primario cometió dos (2) errores que, por versar sobre la apreciación de la prueba, los discutiremos en conjunto. En esencia, DUI arguyó que el foro primario erró al emitir una sentencia sin considerar los hechos relacionados a la posición de DUI cuestionando la adjudicación de credibilidad del TPI. Por su parte, CMC señaló que el foro primario cometió dos (2) errores. Como primer error, CMC adujo que erró al determinar que no probó la cuantía de los daños sufridos a consecuencia del incumplimiento contractual de DUI. En su segundo error, CMC alegó que el foro primario abusó de su discreción al no admitir en evidencia el informe pericial enmendado del CPA Canabal Pérez.

Tras un análisis objetivo, sereno y cuidadoso de todos los documentos que obran en el expediente ante nos, particularmente la voluminosa TPO, en correcta práctica adjudicativa apelativa, concluimos que el TPI no cometió los errores imputados tanto por CMC como por DUI.

Con respecto al primer error planteado por CMC, esta corporación no demostró evidencia alguna que amerite que modifiquemos la determinación del foro primario. No hay evidencia documental ni testifical sobre la cuantía específica de daños más allá del informe pericial del CPA Iván Canabal, el cual no fue admitido en evidencia. Advertimos que, de la TPO presentada surge la alegación

de que la cancelación del contrato fue "súbita, de la nada". Sin embargo, esta discrepa de los documentos presentados ante nos con respecto a las varias deficiencias notificadas por parte de CMC a DUI, por un periodo sustancial de tiempo.[58]

En su segundo error, CMC adujo que el TPI abusó de su discreción al no admitir en evidencia el informe pericial enmendado del CPA Canabal Pérez. Conforme a lo establecido a la Regla 42.2 de Procedimiento Civil, *supra*, R.42.2 y los pronunciamientos del Tribunal Supremo cónsonos a esta regla, nos abstenemos de modificar la admisibilidad del informe pericial, debido a que la determinación del TPI está avalada en el ordenamiento evidenciario aplicable. Adviértase que el perito tuvo amplia oportunidad de testificar y el foro sentenciador le concedió el valor probatorio que estimó pertinente a su testimonio. Este caso cumple con el criterio rector de "ausencia de error, perjuicio, pasión y parcialidad" suficiente para no alterar dicha determinación. Consecuentemente, cumpliremos con brindarle deferencia a las determinaciones de hecho y admisibilidad de evidencia del foro primario.

Por otro lado, DUI imputa que el TPI cometió dos (2) errores con respecto a la apreciación de la prueba, según pormenorizados precedentemente. Nuevamente nos sostenemos en que, no estamos en la misma posición que el foro primario en cuanto a la oportunidad que tuvo de apreciar la prueba presentada y su determinación nos merece plena deferencia. Consecuentemente, no vamos a alterar las determinaciones de hecho ni de derecho del foro primario al estar ampliamente fundamentada en la evidencia documental testifical y pericial que tuvo ante sí. A tenor con lo anterior, nos abstenemos de alterar las determinaciones de hecho y la apreciación de la prueba del TPI.

---

[58] TPO del 29 de marzo de 2023, pág. 424, líneas 10-15.

La determinación recurrida es conforme a derecho. De la evidencia que tuvo ante sí el TPI surge palmariamente que CMC podía terminar su contrato con DUI por justa causa, ante los múltiples incumplimientos que tuvieron consecuencias en la operación del hospital. Por lo que no procede imponer la penalidad por terminación anticipada.

Adviértase que CMC, oportunamente, notificó a DUI que dejaba sin efecto la terminación del contrato en aras de darle una oportunidad a esta última de corregir sus incumplimientos y se pudiera entregar los materiales y rendir el servicio pactado. Fue entonces, a tenor con la prueba desfilada, que DUI se retractó de su determinación que otorgaba un plazo de cinco (5) días laborables para corregir las deficiencias y dio por terminado el contrato al recoger, prematuramente, sus materiales y suspender la entrega de materiales.

Por lo cual, a base de la totalidad de la evidencia desfilada, procede confirmar la determinación del TPI. Los errores señalados no fueron cometidos.

**V.**

Por los fundamentos expuestos, se confirma la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.  La Jueza Rivera Marchand disiente con opinión escrita.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| CARIBE PHYSICIANS PLAZA CORP.<br><br>Apelante<br><br>v.<br><br>DUI INCORPORADO<br><br>Apelados | KLAN202400109<br>Consolidado con<br>KLAN202400111 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso Núm. NSCI201700280<br><br>Sobre: Incumplimiento de Contrato, Daños y Perjuicios |
| ------------------------------<br>CARIBE PHYSICIANS PLAZA CORP.<br><br>Apelados<br><br>v.<br><br>DUI INCORPORADO<br><br>Apelante | | ------------------------<br>*Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso Núm. NSCI201700280<br><br>Sobre: Incumplimiento de Contrato, Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Rivera Marchand[2], el Juez Bonilla Ortiz y el Juez Pagán Ocasio.

**VOTO DISIDENTE DE LA JUEZA RIVERA MARCHAND**

En San Juan, Puerto Rico, a 28 de junio de 2024.

Respetuosamente disiento de la determinación consignada por la mayoría del panel en la que se confirma el dictamen emitido por el foro primario en este caso. A pesar de conferirle la deferencia a la apreciación de la prueba realizada por la juzgadora de los hechos, soy de la opinión de que, procede la revocación de la sentencia apelada. La naturaleza del caso y la controversia ante nos, obligan realizar un análisis de un contrato de adhesión con una

---

[1] Véase Orden Administrativa OAJA-202A-086 del 4 de noviembre de 2021.
[2] Mediante Orden Administrativa OATA2024-024, se designa a la Jueza Monsita Rivera Marchand, en sustitución de la Jueza Olga Birriel Cardona, quien dejó de ejercer funciones como Jueza del Tribunal de Apelaciones.

Número Identificador
SEN2024_____

cláusula penal según pactada por las partes, Caribe Physicians Plaza Corp. h/n/c Caribbean Medical Center (CMC o Caribbean) y DUI Inc. h/n/c ImageFirst Healthcare Laundry Specialists (DUI o ImageFirst).

A esos efectos, procede puntualizar que, en *Coop. Sabaneña v. Casiano Rivera,* 184 DPR 169 (2011) el Tribunal Supremo se pronunció sobre la validez de un contrato de adhesión con cláusula penal. Expuso que, al analizar los contratos de adhesión, resulta imperativo que se atienda otro aspecto paralelo: la interpretación de los contratos. Consignó que:

> Los contratos de adhesión son:
>
> [A]quellos en que el contenido, esto es, las condiciones de la reglamentación son obra de una sola de las partes, de tal modo que el otro contrayente no presta colaboración alguna a la formación del contenido contractual, quedando así sustituida la ordinaria determinación bilateral del contenido del vínculo por un simple acto de aceptación o adhesión al esquema predeterminado unilateralmente".[3]

Sobre lo antes, el Alto Foro explicó que, en nuestra jurisdicción, la interpretación de las disposiciones de un contrato de adhesión se hará favorablemente hacia la parte que nada tuvo que ver con su redacción.[4] Ahora bien, el Alto Foro aclara que, el hecho de que un contrato sea de adhesión significa tan sólo que se analizará del modo más favorable a la parte más débil, pero no que se interpretará de modo irrazonable. Ante tales contratos, la función principal de un tribunal debe dirigirse a evaluar la presencia de cláusulas confusas. En ausencia de ambigüedad, el contrato se interpretará según sus términos. *Íd.* a la pág. 177 citando *S.L.G. Ortiz-Alvarado v. Great American,* 182 DPR 48 (2011); *Martín Pérez v. Universidad Central de Bayamón,* 143 DPR 554 (1997). Despejada

---

[3] Citando a *Maryland Casualty Co. v. San Juan Racing Association,* 83 DPR 559, 566 (1961) (citando a 3 Castán, *Derecho civil español* 332 (1954)).
[4] Citando a *Herrera v. First National City Bank,* 103 DPR 724, 727 (1975); *Ulpiano Casal, Inc. v. Totty MFG. Corp.,* 90 DPR 739, 744 (1964); *Maryland Casualty,* supra.

la apariencia de ambigüedad, el tribunal entonces procederá a evaluar la razonabilidad de lo allí convenido. *Íd.*

Corolario a lo anterior, es preciso señalar que, al amparo del Art. 1108 del Código Civil, 31 LPRA sec. 3133, el tribunal puede modificar una cláusula penal cuando la obligación ha sido satisfecha en parte o de forma irregular. Según la normativa establecida por el Alto Foro, el tribunal debe utilizar su facultad moderadora con gran cautela y justificación, debido a que, la limitación a la autonomía de la voluntad de los contratantes procede únicamente en circunstancias extraordinarias. La intervención judicial solo procede cuando una de las prestaciones resulta excesiva, abusiva y con una desproporción intolerante.

Con ello en mente, es insoslayable determinar, en primer lugar, cuál es la naturaleza del contrato entre las partes en este caso. Al observar el documento contractual surge que, el mismo consiste en una sola página, con el timbrado de ImageFirst y provee para un espacio para incluir información sobre los servicios de lavandería y alquiler solicitados. Es decir, todo el inventario es propiedad de ImageFirst y el servicio de alquiler y lavandería se haría semanalmente. Al final incluye un párrafo que establece lo siguiente:

> IMAGEFIRST HEALTHCARE LAUNDRY SPECIALIST. ("Company") agrees to supply, and the undersigned customer agree to rent the above items on the following terms. **All items are and will remain the property of Company, and the customer agrees to return such items on demand** and to be liable for any loss or destruction of such items, including such loss or destruction caused by customer´s employees, except as a result of normal wear, and to pay therefore, at prevailing customer´s cost for such lost or damaged items. Company agrees to pick up soiled garments and deliver there cleaned, in good wearable condition weekly. Items worn beyond repair will be replaced at Company´s discretion. The decision of style and type of garment used for personal protection has been made by the customer. Company makes no representations that the fluid resistant garment used for personal protection has been made by the customer. Company makes no representations that the fluid resistant garment or any other products described herein will provide complete protection from exposure to contaminants or will eliminate the risk of contracting infectious diseases. The customer acknowledges that the garments rented under the agreement are for general purposes and are not designed

nor intended for use in areas of flammability risk or where contact with ignition source is possible.

The term of this agreement is **for seventy-two (72) months from the date of the first delivery and thereafter for the same time period unless cancelled by either party, in writing, at least ninety (90) days prior to any termination date**. The terms of this contract shall apply to all subsequent increases or additions to such service. There will be a minimum weekly billing of 80% of the agreement value or 80% of the current invoice amount whichever is greater. **Customer may discontinue service at any time provided customer pays Company a cancellation charge of 40% of the agreement value or the current invoice amount, whichever is greater, multiplied by the number of weeks remaining under the agreement. The customer agrees that this cancellation charge is not punitive, but a reimbursement to Company for related investments to service the customer**. Customer agrees to **pay attorney's fees of 15% and cost necessary to collect monies due**. The price in effect may be changed annually. A finance charge of 1 ½% per month, which is equal to 18% per year will be added to all balances not paid within terms. If credit terms are allowed, customer agrees to pay balance due to Company with ten (10) days after the end of the month that said invoices are dated. The agreement shall be binding upon present and or future owners, successors or assigns of customer and Company. Customer warrants that there are no contracts in existence with other textile, rental companies for the same service. If any of the provision of this Agreement are held by a court of competent jurisdiction to be unenforceable, then such provisions sheall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and affect. This is the entire agreement between the parties and supersedes all prior of contemporaneous understandings, oral or written. **No modification of this agreement will be binding unless in writing and signed by Company.** Company and customer hereby (i) consent to the exclusive jurisdiction of any state or federal court in the counties in which image First is located and agrees that subject to Image First´s election, all actions or proceedings arriving under or related to this agreement shall be litigated in such courts, (ii) waive any objection which it may have based upon improper venue or forum non-conveniens. The individual executing this agreement for customer is authorized by customer to do so.

Al concluir el referido párrafo, surgen las firmas de las partes.

De lo antes expuesto, resulta evidente que, nos encontramos ante un contrato de adhesión para un servicio de alquiler y lavandería, cuyo término de 72 meses vigencia es autorenovable y por igual término, salvo previa cancelación. Se desprende claramente de lo redactado, la forma y tiempo de cancelación. Establece que, deberá ser por escrito y dentro de un término anticipado de 90 días. Por su propia naturaleza y según lo establecido en *Cooperativa,* supra, siendo de adhesión, se establece que el otro contrayente no presta

colaboración alguna a la formación del contenido contractual, quedando así sustituida la ordinaria determinación bilateral del contenido del vínculo por un simple acto de aceptación o adhesión al esquema predeterminado unilateralmente. En particular, es de notar que, lo pactado no establece condición alguna para informar causa de cancelación o incumplimientos para justificar una cancelación. Por ello, -con o sin causa-, sólo se requiere una notificación anticipada de 90 días para efectuar la cancelación correctamente sin consecuencia alguna. Es decir, lo expuesto en el contrato, <u>sin ambigüedades</u>, establece que el contrato no contempla una cancelación con efectividad inmediata sin repercusiones. De hecho, se resalta que las partes pactaron que el cliente puede cancelar en cualquier momento. Sin embargo, ante un escenario de cancelación que no cumpla el periodo de 90 días, surge que "the client" (en este caso CMC) aceptó que "the company" (en este caso ImageFirst), procedería al cobro del 40% del valor del acuerdo o el valor de la factura vigente multiplicado por el número de semanas que quedarían bajo el contrato.  Específicamente establece que, CMC está de acuerdo en que el cobro por cancelación no es punitivo sino dicho costo tiene el propósito de acreditar un reembolso o compensación relacionado a los servicios invertidos por ImageFirst para el cliente. No obstante lo anterior, expresamente advierte que, se procederá a incluir un 15% por concepto de honorarios de abogado en el evento que tenga que recurrir a dichos servicios legales para sufragar el proceso de cobro ("to collect monies due"). Asimismo, dispone que, cualquier modificación del contrato tiene que estar por escrito y firmado.

De una lectura de lo antes y conforme a la prueba, las obligaciones de las partes no están en controversia y mucho menos la validez de lo pactado. Por ello, corresponde consignar que, en ausencia de ambigüedad en el contrato, las partes pactaron la

manera para dar por terminado la relación contractual, así como las consecuencias de no cumplir el proceso.

Establecida la naturaleza de lo pactado entre las partes, corresponde revisar si el foro primario adecuadamente justipreció la prueba dirigida para establecer las reclamaciones de las partes. En particular, según las determinaciones previas en el manejo del caso, obliga a adjudicar las controversias consignadas por un panel hermano en el recurso número KLAN202000464. En esa intervención interlocutoria, el panel consignó que el contrato en disputa contiene disposiciones atinentes a las consecuencias de una cancelación temprana. A esos efectos, dictaminó que, para efectivamente determinar la procedencia de la acción principal incoada por CMC y la reconvención de DUI/ ImageFirst, procedía adjudicar controversias en cuanto a la cancelación del contrato por CMC y si el alegado incumplimiento de ImageFirst frustró el propósito contractual. En cumplimiento con dicho mandato, el foro de instancia celebró el juicio y aquilatada la prueba emitió el dictamen apelado, confirmado por la mayoría del panel.

Toda vez que de la *Sentencia* mayoritaria no surgen los hechos consignados por el foro apelado, es necesario resaltar los siguientes:

1. CMC y DUI suscribieron el Contrato Núm. MS00157 el 29 de marzo de 2011 (el Contrato), a tenor con el cual DUI acordó suplir CMC acordó rentar productos sanitarios y de lavandería para el hospital Caribbean Medical Center en Fajardo (el Hospital). [...].

[...]

7. La primera entrega de productos se llevó a cabo el 1 de abril de 2011, dando comienzo al término de 72 meses. *Sentencia TA.*

8. Durante los primeros años del Contrato, no hubo quejas mayores del desempeño de DUI bajo el Contrato. Testimonio de la Dra. López. La Dra. López no recuerda en qué año comenzaron estas. *Id.*

[...]

10. El 8 de septiembre de 2015, la Sra. Jackeline E. Burgos Maldonado le informó mediante correo electrónico al Sr. Carlos E. Bonilla Colón que la calidad de las sábanas era inadecuada por razón de que llegaban rotas y rastros de "tape". Además, la Sra. Jackeline E. Burgos Maldonado le expresó lo siguiente: "hace un tiempo le solicit[é] el Flow Chart, proceso de limpieza y/o quality y no se me ha hecho

llegar. Le solicito si es posible una entrevista con usted[.] Gracias anticipadas." *Sentencia Parcial,* Exhibit Conjunto VII.

11. Doña Gloria Delgado Pabón fungió como enfermera, supervisora de sala de operaciones y luego directora de enfermería de CMC. Ya no es empleada de CMC y trabaja en Doctors´ Hospital desde el 2019. Sus funciones como supervisora de sala de operaciones incluían validar los suministros de materiales y ropa quirúrgica que suplía DUI a CMC. Durante el periodo relevante a este caso, observó que **en ocasiones** faltaban los suministros de la ropa quirúrgica que debía suministrar DUI, provocando que CMC tuviera que cancelar cirugías programadas o que, al tener que programarlas se tuviera que recurrir a la activación fuera de turno regular de técnicos de sala de operaciones (o sea, *overtime*). *Testimonio Delgado.*

12. Doña Sandra Reyes Delgado trabaja en CMC desde 2011. Actualmente es la Compradora a cargo del inventario de suministros del hospital. En esa función manejaba los reclamos de los distintos departamentos de CMC con relación a las deficiencias en los suministros de DUI. También remitía estos reclamos a DUI, en ocasiones verificaba entregas, y **coordinaba con los empleados de DUI para corregir las deficiencias** que surgían en promedio semanalmente por ca[u]sa de deficiencias e insuficiencias en el suministro. Testimonio Reyes.

13. Doña Patricia de Frías es licenciada en Derecho y en Administración de Hospitales. Del 2015 al 2017 trabajó en CMC como Directora de Programas Institucionales y Manejo de Riesgos Encargada de Calidad. Desde 2019 funge como Directora Ejecutiva Asociada de Lifelink de Puerto Rico. En CMC estuvo a cargo de control de inspecciones, calidad, facultad médica y manejo de riesgo en el Hospital. Cuando llegaba al Hospital por las mañanas solía hacer y supervisar un conteo de materiales, y en múltiples ocasiones constató que los abastos suplidos por DUI eran insuficientes porque incluían scrubs y sábanas inservibles por estar rotas o manchadas con sangre. La Sra. Frías entonces impartía instrucciones a Doña Sandra Reyes para que **se comunicara con DUI para requerir que se corrigiera la situación. Lo cual, en ocasiones, resultaba en entregas de materiales adicionales.** *Testimonio Frías.*

[...]

17. La licenciada Ana Oliveras Laguna funge como Administradora del Hospital desde el año 2016. Previo a ello trabajó como administradora asociada en el Hospital de Universidad de Puerto Rico en Carolina Dr. Federico Trilla. Tiene estudios especializados de maestría en administración de servicios de salud de la Universidad de Puerto Rico y certificación esterilización de áreas quirúrgicas y reprocesamiento de instrumentos de sala de operaciones. Como Administradora del Hospital **tuvo que lidiar con frecuentes dilaciones y ocasionales cancelaciones** en las cirugías programadas causadas por falta de scrubs quirúrgicos como consecuencia de las deficiencias en el servicio que bri[n]daba DUI y las entregas tardías -o sea, después de las 7:00 a.m., hora clave para arrancar las cirugías, y en horarios inconsistentes que dificultaban la coordinación de asuntos. *Testimonio Oliveras.*

18. Oliveras llamó en múltiples ocasiones a la Sra. Mayra Santiago, su contacto en DUI, para atender asuntos de deficiencias en el servicio, cuando las gestiones hechas por personas de menor jerarquía en el Hospital habían resultado infructuosas. *Testimonio Oliveras.* Los problemas eran tanto de horario como de cantidad. *Id.* La Sra. Santiago le atendía amablemente y le aseguraba que **atendería las deficiencias**

**(decía "voy a hacerlo"). Luego de lo cual, el servicio solía mejorar temporalmente**, pero volvía a experimentar deficiencias. *Id.*

19.    En marzo de 2017, las señoras Frías, Cotto, Reyes y Oliveras de CMT se reunieron con la señora Marybee Alvarado y el Sr. Juan Corro de DUI, para abordar el tema de las deficiencias en los suplidos con documentos de soporte a la mano. Testimonios Oliveras y Frías y Exhibit Conjunto IV. Durante la reunión, Oliveras solicitó que, en vista de que DUI había demostrado que no podía programar entregas consistentemente antes de las 7:00 a.m., se entregaban suministros para un día adicional y coordinar a base de un día por adelantado. *Id.* A esos efectos solicitó una cotización, que DUI nunca proveyó. *Id.* **Luego de la reunión, algunos días suplían mayor cantidad, pero el servicio seguía siendo inconsistente**. La mejoría duró muy poco esta vez. Oliveras volvió comunicó sus quejas a DUI, sin lograr resultados. *Id.* Nunca se recibió la cotización para un día adicional de suministros que hubiera podido servir de resguardo para evitar tener que seguir incurriendo en cancelaciones de cirugías y otras medidas, tales como *overtime* de personal de enfermería, que afectaban la operación del Hospital y su rentabilidad *Id.*

20.    Según Reyes, "nunca teníamos el suplido completo para poder funcionar." Esto a su vez afectaba las operaciones del hospital porque no se podían llevar a cabo las operaciones sin los suplidos de ropa quirúrgica para vestir a los técnicos de sala. *Testimonio Reyes.*

[…]

22.    En mayo de 2017, se reunieron Oliveras y la Dra. López. La primera informó a la segunda que los problemas y deficiencias en el servicio que brindaba DUI persistían a pesar de múltiples comunicaciones, gestiones y promesas. A raíz de esa conversación, decidieron que la situación era insostenible y estuvieron de acuerdo que procedía enviar la siguiente carta a DUI el 19 de mayo de 2017. *Testimonios Oliveras y López.*

"Re: Terminación de Contrato Núm. MS00157

Estimado señor Bonilla:

El término de setenta y dos (72) meses del contrato de referencia expiró el 30 de marzo de 2017. Caribbean Medical Center no interesa extender este contrato más allá de dicha fecha. Por tal motivo, **a partir de la notificación de esta comunicación Image First no tendrá que rendir servicio alguno para nuestra empresa**.

Sin otro particular por el momento, y

Cordialmente,

Dra. Sara López Martín

[…]". *Sentencia Parcial.*

[…]

27.    Luego de la reunión entre Oliveras y Rivera, Oliveras se reunió con la Dra. Sara López y hablaron de darle otra oportunidad a DUI. *Testimonio Oliveras.*

28.    DUI respondió a la Carta del 19 de mayo de 2017 con una carta fechada al 22 de mayo de 2017:

"Re: Carta con fecha de 19 de mayo de 2017 -Terminación de Contrato Núm. MS00157

Estimada Sra. López,

[…] **Adjunto le incluimos copia de la factura por concepto de terminación de contrato por parte de Caribbean Medical Center.** Esta factura no incluye facturas pendientes de pago y costos por inventario extraviado al momento de realizar el recogido del mismo.

Para su conveniencia **adjunto copia del contrato, y una hoja de cálculo de la terminación del mismo. Le recomendamos que consulte con su asesor legal. Si usted**

**tiene alguna duda o pregunta sobre este particular debe comunicarse con el Sr. Reinaldo Rivera […] dentro de los próximos cinco días laborales. Luego de haber pasados los cinco días, someteremos su petición de cancelación de contrato a nuestra división legal.**

Cordialmente,

Sr. Carlos E. Bonilla

Presidente

[…].” […].

29. **Bonilla testificó que él escribió una carta a CMC exigiendo el pago en 5 días de la penalidad por cancelación anticipada y advirtiendo que si no recibía el pago en 5 días pasaría a cobro a la división legal.** *Testimonio Bonilla.* Esta interpretación de la Carta del 22 de mayo de 2017 nos parece forzada e inconsistente con el lenguaje de la carta enviada el 22 de mayo de 2017, por DUI a CMC.

[…]

31. El 23 de mayo de 2017, DUI recogió su inventario de las facilidades de CMC. *Sentencia Parcial.* DUI removió todo su inventario del Hospital sin aviso previo, antes de que transcurrieran los 5 días mencionados en la Carta del 22 de mayo de 2017, provocando un estado de emergencia en el Hospital. Testimonio Dra. López. En pocas horas, otra compañía pudo suplirles las necesidades inmediatas, y no fue necesario cerrar las operaciones del Hospital. *Id.*

32. El 24 de mayo de 2017, CMC, por conducto de su representación legal, envió la siguiente carta a DUI, mediante correo electrónico al Sr. Bonilla y por correo regular a la dirección postal de DUI:

Estimado señor Bonilla:

Nuestro cliente, Caribbean Physicians Plaza Corp. h/n/c/ Caribbean Medical Center (en lo sucesivo "CMC"), nos ha referido su comunicación del 22 de mayo de 2017, para el trámite correspondiente. Por lo tanto, en lo sucesivo toda comunicación relacionada con este asunto deberá dirigirla al suscribiente.

**De salida, le informo que CMC desiste y deja sin efecto su comunicación del 19 de mayo de 2017 mediante la cual se le informaba la intención de no continuar utilizando los servicios de su compañía bajo el contrato de referencia núm**. MS00157 (en lo sucesivo, el "Contrato"). No obstante, deseamos aprovechar esta oportunidad para traer a su atención varios incidentes que ameritan su inmediata atención.

Primeramente, en la reunión sostenida en CMC el 16 de marzo de 2017, a la que asistieron los empleados de ImageFirst Mariby Alvarado y Juan Coto, se les informó a éstos que ImageFirst no estaba cumpliendo sus obligaciones bajo el Contrato. Específicamente, se les informó que (i) los *scrubs* de sala de operaciones no están llegando a tiempo; y (ii) la distribución de las sábanas en los distintos departamentos no cumplía con la necesidad requerida. Más adelante, en el mes de abril de 2017, la Lcda. Ana Oliveras le informó a usted durante una visita a CMC que estas deficiencias aún persistían.

En segundo lugar, mediante comunicación dirigida a usted el 18 de septiembre de 2015, ya CMC le había informado que la calidad de las sábanas no era apropiada, venían rotas y con residuo de cinta adhesiva. Además, se le requirió que proveyera copia del procedimiento de limpieza, desinfección y proceso de calidad. No obstante, a esta fecha ninguno de estos documentos ha sido producido a CMA.

Por otro lado, el 28 de febrero de 2017, la Sra. Karen Vega, Supervisora de Sala de Operaciones de CMC, le informó telefónicamente a la Sra. Mayra Santiago, que para ese

entonces la cantidad de *scrubs* disponibles no eran suficientes, por lo que necesitaría más para el día siguiente. No obstante, al siguiente día, ImageFirst no entregó a tiempo los *scrubs* a CMC, lo que requirió la compra de *scrubs* desechables para atender las cirugías pendientes para ese día.

La falta de *scrubs* ha provocado pérdidas económicas a CMC ya que ella ha resultado en la cancelación de cirugías. De ello fue informado el Sr. Reynaldo Rivera por la Lcda. Ana Oliveras el 23 de mayo de 2017 en una reunión sostenida en CMC.

A pesar de los reclamos de CMC, ImageFirst continúa incumpliendo sus obligaciones contractuales pues, las entregas de las sábanas no se ajustan a las cantidades solicitadas. Las entregas de los *scrubs* tampoco se ajustan a los requerimientos de CMC.

Finalmente, el 23 de mayo de 2017, ImageFirst removió de CMC todos los suplidos, incumpliendo así nuevamente sus obligaciones. Imag[e]First deberá suplir a CMC conforme los convenido en o antes de las 6:00 a.m. del viernes, 26 de mayo de 2017.

Por los anteriores señalamientos, **CMC le informa su intención de declarar incumplido el Contrato y requerir la terminación del mismo conforme a derecho**. No obstante, **con el fin de conferirle a ImageFirst un término para subsanar los antes aludidos eventos de incumplimiento, y evitar ulteriores complicaciones legales, CMC le confiere a ImageFirst un término vencedero el viernes, 26 de mayo de 2017."** *Exhibit Conjunto IV.*
[...] (Énfasis nuestro.)

Basado en lo antes, el TPI se limitó a emitir una sentencia declaratoria a los efectos de establecer que, DUI incumplió el contrato con CMC y pretendió abusar de sus prerrogativas contractuales a pesar de estar en incumplimiento de contrato. El TPI consignó lo siguiente: CMC podía terminar su contrato con DUI por justa causa, por incumplimiento de contrato, y no procede penalidad por terminación anticipada. Toda vez que CMC no logró establecer la cuantía de los daños sufridos a consecuencia del incumplimiento contractual de DUI, no se concede indemnización de daños. A tenor con la Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1, las costas son por cuenta y cargo de la Demandada.

Ciertamente no es de sorprenderse que, ambas partes acuden ante esta Curia en búsqueda de una revisión judicial. De una lectura de los 36 hechos consignados por el foro primario se desprende la ocurrencia de ciertas deficiencias e incumplimientos entre los años 2015 y 2017 que no se describen de forma particularizada y en

ocasiones se constata que fueron atendidos en algunas ocasiones. Tan es así que, el foro primario concluyó que, no había suficiente prueba para determinar daños en un caso en que se imputa incumplimientos en un contrato de servicios cuantificables. De otra parte, el TPI denegó la súplica expuesta en la reconvención, a los fines de que se reconociera que los incumplimientos no invalidaron el contrato de adhesión y las consecuencias de una cancelación efectuada distinto a lo pactado en la cláusula penal. La mayoría del panel expone en su dictamen que, procede confirmar la determinación apelada, por la deferencia a la apreciación de la prueba. Además, en el párrafo final adopta la teoría que, en este caso el periodo de 5 días era un periodo de tiempo para corregir deficiencias y fue Imagefirst quien dio por terminado el contrato al recoger prematuramente el inventario.

De un examen sosegado del expediente y de la totalidad de las circunstancias del caso, a la luz del derecho aplicable, arribamos a otra conclusión. La prueba sustenta las alegaciones de la demanda número 6 y 7 sobre los incumplimientos de DUI del 8 de septiembre de 2015, del 28 de febrero de 2017, así como las instancias de correcciones parciales e inconsistentes. Conforme a la normativa antes expuesta, cuando estamos ante incumplimientos y actos defectuosos en una relación contractual, solo procederá la resolución del vínculo contractual si se frustró la finalidad contractual para la parte perjudicada. No todo incumplimiento defectuoso puede tener el efecto de liberar a la otra parte de cumplimiento. En este caso, CMC canceló el contrato con efectividad inmediata sin notificar por escrito los incumplimientos previos y luego desistió de su determinación de rescisión inmediata. Asimismo, pretendía que su decisión inmediata no tuviera ninguna consecuencia incluyendo que ImageFirst le dejara el inventario después de notificar la cancelación con efecto inmediato. Añádase a

ello que, el contrato claramente establece que, para recobrar los costos por cancelación temprana se recurriría a servicios legales por lo que se incluye un costo de 15% por honorarios de abogados, de ser necesario. Ciertamente, las inferencias expuestas en el dictamen sobre lo antes, no coinciden con lo claramente pactado en el contrato sin ambigüedades. No surge que las partes hayan pactado un periodo de cinco días para una nueva negociación o reconsideración antes de recurrir al proceso de cobro.

Con este cuadro fáctico (donde se resalta que, según la apreciación de la prueba, CMC no pudo demostrar daños por las incidencias de incumplimientos de ImageFirst y luego reconsidera la cancelación del contrato) no se reúnen los factores y hechos necesarios para autorizar la rescisión del contrato y mucho menos para invalidar el proceso de cancelación y reembolso, según pactado por las partes.

Por ello soy de la opinión de que, el foro primario debió realizar un segundo análisis para determinar si las circunstancias de este caso justificaban modificar la cláusula penal, al amparo del Art. 1108 del Código Civil, *supra*, que permite la modificación de una cláusula penal cuando la obligación ha sido satisfecha en parte o de forma irregular. El Tribunal Supremo en *Xerox Corporation v. Gómez Rodríguez y otros,* 201 DPR 945 (2019)*,* advirtió que la cláusula penal tiene un fin punitivo porque los daños del acreedor sobrepasan su medida real para presionar al deudor a que cumpla la obligación, sin tener que pagar una indemnización mayor a la acordada. Además, reconoció que el Art. 1108*, supra,* sirve para subsanar los excesos en la prestación garantizadora. No obstante, el Tribunal Supremo ratificó la doctrina establecida en *Cooperativa Sabaneña v. Casiano Rivera,* supra, y reiteró que el Art. 1108, *supra,* permite moderar la pena. Ahora bien, la modificación de la cláusula penal únicamente procede en circunstancias extraordinarias, como

medio de templar su excesiva onerosidad para el obligado a la desorbitada desproporción.

Luego de un análisis sosegado de la presente causa y tomando en consideración las circunstancias expuestas en este caso a la luz de la normativa aplicable, soy de la opinión de que, procede como cuestión de derecho, revocar el dictamen y devolver el asunto ante el foro primario para que se efectúe una modificación sobre los efectos de la cláusula penal. Lo antes, en aras de evitar un resultado desproporcional e injusto. Coincido con la apreciación de la mayoría en su pronunciamiento sobre el recurso KLAN202400109 no así en el recurso KLAN202400111.

Por todo lo antes, respetuosamente disiento.


**Monsita Rivera-Marchand**
**Jueza de Apelaciones**